Russell MOKHIBER, Appellant,

v.

Leonard DAVIS, et al., Appellees.

No. 86–89.

District of Columbia Court of Appeals.

Argued Dec. 9, 1986.
Decided Feb. 17, 1988.

---

Cornish F. Hitchcock, with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellant.

Jeffrey C. Slade, with whom Ronald W. Meister, Brenda Wright and Sidney S. Rosdeitcher, New York City, were on the brief, for appellee Colonial Penn Corp., Inc. and related appellees.

Salvatore A. Romano, with whom Robert B. Hirsch and Michael L. Sibarium, Washington, D.C., were on the brief for Association Parties.

Before PRYOR, Chief Judge, and FERREN and STEADMAN, Associate Judges.

PER CURIAM:

Russell Mokhiber, an investigative reporter, filed a motion to intervene in a suit settled by the original parties four years earlier. He was trying to remove protective orders that barred public access to various documents held by the court. The trial court denied his motion, and Mokhiber now appeals. This case, therefore, requires us to consider under what circumstances the public enjoys the right to view different sorts of court records in a civil case.

The trial court ruled, first, that Mokhiber's motion was untimely because of the long passage of time between settlement of the suit and his motion to intervene. The court went on, however, to observe that, even had it been timely, Mokhiber's motion did not meet the other requirements for intervention either as of right or by permission, for he had "failed to establish that there exists a common law or constitutional right of access to documents which were the products of *pretrial* discovery in cases which never went to trial." We conclude that, on the facts of this case, the trial court erred in ruling that Mokhiber's application was untimely. As to the court's alternative ground for denying intervention, we affirm in part and reverse in part. The trial court failed to distinguish between pretrial discovery materials and other sealed documents—two classes of records which the law accords different treatments. Mokhiber has no common law or constitutional right of access to pretrial discovery materials, and he therefore has no standing to challenge either the protective orders themselves or the sealed discovery materials in the court's possession. He does, however, have a presumptive right of access under the common law to view documents, such as motions and oppositions, that the parties submitted to the

court for decision but the court placed under seal. With respect to this latter class of records, we remand for the trial court to grant Mokhiber's motion to intervene. The trial court must then exercise its discretion to determine whether Mokhiber is entitled to access or whether, instead, there are sufficient countervailing reasons to retain the protective orders.

## I.

Russell Mokhiber is writing a commentary on several recent examples of corporate misconduct in America. Among the case studies that have drawn his interest is the relationship formed in the mid–1950s and consolidated over the next twenty years between Colonial Penn Group, Inc. (CPG), an insurance company, and two associations for retired persons, the American Association of Retired Persons (AARP) and the National Retired Teachers Association (NRTA) (collectively, the Associations). A number of lawsuits arose out of this relationship, among them an action brought in 1978 in the District of Columbia by Harriet Miller, who had been fired from the executive directorships of both Associations. *Miller v. Davis*, Civil Action No. 4367–78 (D.C.Super.Ct. May 2, 1978); *American Ass'n of Retired Persons v. Miller*, Civil Action No. 5569–78 (D.C.Super.Ct. May 31, 1978). *See also Malchman v. Davis*, 706 F.2d 426 (2d Cir.1983), *on remand*, 588 F.Supp. 1047 (S.D.N.Y.1984), *aff'd as modified*, 761 F.2d 893 (2d Cir.1985), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986). Miller alleged that the Associations had fired her at the instigation of Leonard Davis, the founder and director of CPG, who, she charged, over the years had gained *de facto* control of the Associations. According to Miller, Davis had moved against her when he came to fear she would interfere with the exclusive and lucrative contracts he had established between CPG and the Associations to provide health insurance for Association members.

During the course of discovery in Miller's suit, the trial court issued protective orders that barred the parties from disclosing information gained in discovery to third persons. The protective orders created two classes of protected documents. "Produced Information" included all interrogatory answers, admissions, deposition testimony, and any other record obtained in discovery. The parties were forbidden to use "Produced Information" for any purpose other than preparation for trial. "Confidential Material" included material produced by CPG that revealed trade secrets, as well as documents containing personnel information or minutes of each Association's Board of Directors, Executive Committee, or Trustees. "Confidential Material" was to be filed with the court under seal.

The parties settled the suit in 1980, before trial began. Pursuant to a stipulation of the parties, the trial court signed a "consent order and decree" deeming the settlement agreement an order and decree of the court, specifically enjoining the parties to adhere to their settlement agreement, and retaining jurisdiction over any dispute that might arise over the consent decree. Among other provisions, the settlement required that Miller return to CPG and to the Associations all documents gained through discovery, and that only Miller's attorneys retain transcripts and depositions obtained during the lawsuit. The settlement also called for Miller to withdraw her pending motion to modify the existing protective orders and to refrain from challenging the orders in the future.

Miller had filed a motion seeking modification of the protective orders, as well as her pretrial brief, under seal; and CPG and the Associations had filed several opposition papers under seal (in addition to the discovery documents they considered confidential). Presumably, these pleadings contained "Confidential Material" under the terms of the protective orders. At present, then, the trial court still holds under seal a variety of documents that include: (1) materials produced during discovery and filed under the "Confidential Materials" provisions of the protective orders, (2) Miller's "motion" to modify the protective orders, (3) the defendants' oppositions to this motion, (4) the Associations' oppositions to two of Miller's discovery motions, and (5)

the Association's opposition to Miller's motions for a continuance and for a modification of her claim for damages. Thus, the protective orders continue both to bar the parties from disseminating any information they gained during the discovery process (including any depositions or transcripts they still have in their possession), and to retain the seals on those documents filed under seal with the court.

Nearly four years after the court ratified the settlement, Mokhiber sought intervention in order to challenge the protective orders. By removing the protective orders, or at least by lifting their protections from some of the discovery material and court papers they now screen from public view, Mokhiber hopes to obtain documents shedding further light on CPG's relationship with the Associations. Specifically, Mokhiber has asked the trial court to remove the protective order on "Produced Information" and open the sealed documents unless one of the parties could "show cause" that the documents should remain closed because they contain business secrets or privileged information. Mokhiber bases his claim to intervene and to lift or alter the protective orders on asserted common law and first amendment rights of public access to judicial records.

## II.

■ To intervene, either as of right or by permission, one must make "timely application" for intervention. Super.Ct.Civ.R. 24. The trial court denied Mokhiber's application as untimely because Mokhiber sought to enter the suit only after the parties had reached settlement and because a long period of time had passed between settlement of the case and the filing of his motion. The determination of timeliness lies within the sound discretion of the trial court. *Vale Properties, Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 15 (D.C. 1981). We conclude, nonetheless, that the trial court misapplied the standard for timely intervention; we therefore reverse the trial court's ruling on this point. We base this conclusion primarily on our view that, because of the peculiar characteristics of the public's right of access to judicial

records, considerations of timeliness should not generally bar intervention to litigate such a claim.

■ In determining the timeliness of an application for intervention, the trial court ordinarily must consider a number of factors: (1) the time that has passed since the applicant knew or should have known of his or her interest in the suit; (2) the reason for the delay; (3) the stage to which the litigation has progressed; and (4) the prejudice the original parties would suffer from granting intervention and the applicant would suffer from denial. *Emmco Ins. Co. v. White Motor Corp.*, 429 A.2d 1385, 1387 (D.C.1981). The individual factors are significant, for they establish the relative burdens the applicant, the parties, and the court must bear and thus allow the court to evaluate the justice and efficiency of permitting intervention in a particular lawsuit. As this case illustrates, however, application of these factors may depend in part on the particular kind of claim an intervenor seeks to litigate. *See, e.g., United States v. American Telephone & Telegraph Co.*, 206 U.S.App.D.C. 317, 326, 642 F.2d 1285, 1294 (1980).

■ The trial court initially observed that Mokhiber sought to intervene after judgment in the underlying suit. The court stated that intervention after judgment shall be granted only in "extraordinary circumstance," which Mokhiber had failed to prove. *See, e.g., Delaware Valley Citizens' Council For Clear Air v. Pennsylvania*, 674 F.2d 976, 980 (3d Cir.), *cert. denied*, 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed. 2d 165 (1982). Whatever merit this standard may have for intervention cases in general, the trial court, in applying it to the present suit, did not take into account the special nature of the right Mokhiber seeks to assert once permitted to intervene. Ordinary principles applicable to intervention do not work well here. The filing of a motion to intervene is simply recognized as an appropriate means of raising assertions of public rights of access to information regarding matters in litigation. "Intervention of this type may properly be termed *de bene esse*, to wit, action that is provisional

in nature and for the limited purpose of permitting the intervenor to file a motion, to be considered separately, requesting that access to proceedings or other matters be granted." *Commonwealth v. Fenstermaker*, 530 A.2d 414, 416 n. 1 (Pa.1987).[1]

Mokhiber claims a common law and first amendment right to view court records and argues that the protective orders bar him from obtaining documents that fall within this right of access. To the extent this right exists, it exists today for the records of cases decided a hundred years ago as surely as it does for lawsuits now in the early stages of motions litigation. The fact that a suit has gone to judgment does not in any sense militate against the public's right to prosecute a substantiated right to see the records of a particular case. Moreover, access to court records does not involve relitigation of the underlying dispute, so the rationale behind requiring extraordinary circumstances for postjudgment intervention does not as a rule apply to access claims. It is important to note that, particularly when a case has been settled, the fact that a motion to intervene is filed after judgment may prove relevant to the *merits* of the intervenor's access claim. *Infra* Part V. But the applicant need not plead extraordinary or changed circumstances to show that the intervention motion itself is timely.

The trial court also observed that Mokhiber had no excuse for the four-year delay between settlement of the suit and his application to intervene. Mokhiber stated that he personally had become aware of the suit only one year before he filed for intervention. The trial court suggested that Mokhiber might be held responsible for knowing of the suit earlier, since he is employed by the Corporate Accountability Research Group (CARG), a public interest "watchdog" organization that should keep tabs on such cases. The court correctly put this consideration aside, however, for CARG is not the applicant in this case.

Nonetheless, the trial court found that Mokhiber had no excuse for the remaining one-year delay.

Again, however, it is important to consider the specific kind of claim Mokhiber is making: he asserts a public right of access, that is, a right that any member of the public can assert. It would make little sense to deny Mokhiber intervention merely because he had known about the case for a single year, while allowing intervention, for example, by a college student who has just begun her senior thesis on the topic. Given the public character of the right, the court should not readily refuse intervention for reasons that do not apply generally to all members of the public. While there may well indeed be circumstances where a trial court, in the exercise of its discretion, will rightly conclude that untimeliness or other factors relating to the particular claimant justify refusal of intervention, we do not think that the one-year delay standing alone is sufficient to warrant such a refusal here.

The trial court did conclude that Mokhiber's motion was untimely, in part, because secrecy was integral to the settlement reached four years earlier. Observing the potential inequity of ratifying a settlement in which future secrecy was an essential element and then later lifting that secrecy at the behest of a third party, the trial court suggested that "the significant length of the delay is likely to work an even greater injustice on the parties who relied on continuance of the protective orders as a condition of settlement." This consideration presumably applies to any potential applicant, whatever the reason for not moving to intervene until four years after settlement.

We have concluded, however, that the prejudice the parties would suffer from postjudgment access to court documents should not determine the timeliness of the intervention to assert a common law or constitutional right of access. Instead, as-

---

**1.** Alternate means of asserting the right, such as a mandamus action against the clerk of court, would appear to require clumsier and more prolix proceedings, involving a trial court perhaps unfamiliar with the underlying litigation, the necessity of joining the original parties, and the like.

suming an intervenor does assert a legitimate, presumptive right to open the court record of a particular dispute, the potential burden or inequity to the parties should affect not the right to intervene but, rather, the court's evaluation of the merits of the applicant's motion to lift the protective order—that is, the court's judgment as to whether, under the circumstances, the balance of equities favoring sealing overrides any presumptive right of access. We turn to that balancing process.

## III.

### A.

We begin with an analysis of the nature of the right of access Mokhiber asserts. "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed. 2d 570 (1978) (footnotes omitted). In recent years, the federal courts have sought to refine the contours of this right. The circuit courts of appeal that have ruled on the issue have affirmed a presumptive right of access to a broad range of court records in civil cases. In particular, these courts have held that the public enjoys a presumptive right of access to the transcripts of hearings on pretrial motions, *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066–71 (3d Cir.1984) (as amended) (under first amendment and common law), to the record of administrative proceedings under judicial review, *Brown & Williamson Tobacco Corp. v. Federal Trade Commission*, 710 F.2d 1165, 1179–80 (6th Cir.1983) (same), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984), to all motions filed with the court, *Bank of America National Trust & Savings Ass'n v. Hotel Rittenhouse Assocs.* (hereinafter *Hotel Rittenhouse*), 800 F.2d 339, 343–44 (3d Cir.1986) (under common

law), to documents submitted in support of motions filed with the court, *In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308-09 (7th Cir.1984) (under first amendment and common law); *Joy v. North*, 692 F.2d 880, 893–94 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), and to settlement agreements submitted to the court for approval, *Hotel Rittenhouse*, 800 F.2d at 343–45; *see also Wilson v. American Motors Corp.*, 759 F.2d 1568, 1570 (11th Cir. 1985) (affirming common law right of access to civil trial records); *Newman v. Graddick*, 696 F.2d 796, 801–02 (11th Cir. 1983) (holding constitutional right of access applies to pretrial, trial, and post-trial proceedings in civil suits "which pertain to the release or incarceration of prisoners and the conditions of their confinement"); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 101 F.R.D. 34, 41-43 (C.D.Cal.1984) (affirming common law right of access to pretrial briefs and statements, to summary judgment motions, and to supporting affidavits and exhibits). The trend of these decisions is clear: "there is general agreement among the courts that the public's right of access attaches to decisions 'of major importance to the administration of justice.'" *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 11 (1st Cir.1986) (quoting *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir.1984)).

As indicated, some courts have premised the presumptive right of access to records on common law grounds; others have invoked the first amendment as well. In the *Nixon* case, the Supreme Court recognized the presumptive right of access to court records as one based on the common law.[2] Similarly, caselaw in our own jurisdiction has relied on the common law tradition. The seminal case of *Ex parte Drawbaugh*, 2 App.D.C. 404 (1894), which discussed English precedent, was an early recognition of the right.[3] *See also United States*

---

**2.** Indeed, although as our colleague's opinion fairly points out, the factual situation in *Nixon* was significantly different from that before us, the Supreme Court rejected the argument that the first amendment required such access in that case. In so doing, the Court noted that the

contents of the sought-after tapes already had been made widely available, so that there was no question of a truncated flow of information to the public. 435 U.S. at 609, 98 S.Ct. at 1318.

**3.** *See Application of NBC*, 828 F.2d 340, 352 n. 7 (6th Cir.1987) (Ryan, J., dissenting); *In re Knox-*

v. Burka, 289 A.2d 376 (D.C.1972) (access to transcript of criminal proceedings); *United States v. Mitchell,* 179 U.S.App. D.C. 293, 298–99, 551 F.2d 1252, 1257–58 (1976), *rev'd sub nom. Nixon v. Warner Communications, supra.*

We deal here with a question of access to court records, not to court proceedings. Thus, the line of recent Supreme Court cases dealing with press access to criminal proceedings, relying on first amendment considerations, are not wholly apposite. *See Press–Enterprise Co. v. Superior Court of California,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), and cases cited.[4] As has been pointed out, the Supreme Court

has been most circumspect in its language, limiting the public's constitutional right of access in criminal case litigation to a right to attend criminal proceedings. The right, the Court has said, is one to attend certain "places and process[es]". *Press–Enterprise [Co. v. Superior Court of California,* 478 U.S. 1, ——, 106

S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986)]. It has never held that the right is one of access to documents in the court record relating to those proceedings.

*Application of NBC,* 828 F.2d 340, 350–51 (6th Cir.1987) (Ryan, J., dissenting) (footnote omitted).[5] Indeed, to date, the Supreme Court has yet to determine that access to civil proceedings of any type (much less to records) rises to the status of a constitutional right under the first amendment. *Cf. Morgan v. Foretich,* 521 A.2d 248 (D.C.1987) (recognizing qualified constitutional right of contemnor in civil litigation not to be incarcerated in a secret proceeding).

Furthermore, appellant does not seek access to exhibits or to other court records submitted at open trial.[6] Rather, at issue here are records dealing with pretrial matters in civil litigation, where, as pointed out in a recent law review article, somewhat different considerations are at stake. If a particular document turns out to be rele-

*ville News–Sentinel,* 723 F.2d 470, 474 (6th Cir. 1983).

**4.** In according access to criminal trials the dignity of a constitutional right, the Court has acted on its perception that not only do open trials enjoy an ancient history, but also public access serves the values embodied in the first amendment. "Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs,' *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 604, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) (further citations omitted); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 575–77, 100 S.Ct. 2814, 2842, 65 L.Ed.2d 973 (1980) (plurality opinion); *id.* at 582, 100 S.Ct. at 2830 (Stevens, J., concurring); *id.* at 587–88, 100 S.Ct. at 2833 (Brennan, J., concurring). Most lower federal courts addressing the question have found the same reasoning to require constitutional protection for the historical right of access to civil proceedings, *see, e.g., Publicker Industries,* 733 F.2d at 1066–67; *Brown & Williamson Tobacco,* 710 F.2d at 1178–79; *In re Continental Illinois Securities Litigation,* 732 F.2d at 1308, although some courts have chosen to rely solely on the common law,

*see, e.g., Hotel Rittenhouse,* 800 F.2d at 343. No court has expressly concluded that the first amendment does not guarantee some right of access to civil trials.

**5.** The Supreme Court of Pennsylvania recently based on the common law its holding that the public had a presumptive right to see arrest warrant affidavits, but with access subject to the "sound discretion" of the trial court. *Commonwealth v. Fenstermaker,* 530 A.2d at 420. The court said it did not need to reach the first amendment claim.

**6.** In *In re CBS,* 828 F.2d 958 (2d Cir.1987), the United States Court of Appeals for the Second Circuit reaffirmed its position that under the common law, evidence presented in a public court session is open to public inspection and copying absent "'the most extraordinary circumstances.'" *Id.* at 959 (quoting *In re NBC,* 635 F.2d 945, 952 (2d Cir.1980)). The first amendment was not mentioned. That circuit has relied on the first amendment in finding, in a criminal case, a qualified right of access to pretrial motion documents "that themselves implicate the right of access" to judicial proceedings. *In re New York Times,* 828 F.2d 110, 114 (2d Cir.1987) (motions relating to permissible evidence at trial). *See also In re Washington Post Co.,* 807 F.2d 383, 390 (4th Cir.1986) (first amendment right of access applies to documents filed in connection with criminal plea and sentencing hearings).

vant to and probative of the issues at trial, the information presumably will be revealed at such proceedings. Pretrial documents are not critical to promoting trial understanding and may contain prejudicial and sensitive material that would be inadmissible at the trial itself. Public access to pretrial materials may discourage and complicate the submission of discovery documents and may inhibit the settlement of litigation. Finally, civil litigation generally deals not with the coercive power of the state exercised against an individual in satisfaction of a wrong to the public-at-large, but, rather, concerns disputes between private parties. The parties have selected the civil courts as one of a number of acceptable dispute resolution mechanisms. The public interest in preliminary sparring between two parties protected by the adversary system is significantly different from the public interest in preliminary criminal proceedings. *Recent Development, Public Access to Civil Court Records: A Common Law Approach*, 39 VAND.L.REV. 1465, 1498–99 (1986).

The major difference [7] between viewing the right of access as a common law, not constitutional, guarantee appears to be that a common law right is more easily overcome by reasons favoring secrecy. *See Anderson*, 805 F.2d at 13 (common law right of access "is more easily overcome than the constitutional right of access"); *Hotel Rittenhouse Assocs.*, 800 F.2d at 344 (stating that, under common law right, court record may be kept secret when "factors militating against access" outweigh "the strong common law presumption of access," whereas constitutional basis would impose more difficult test permitting secrecy only upon showing " 'an overriding interest based on findings that closure is narrowly tailored to serve that interest' ") (citing *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104

S.Ct. 819, 824, 78 L.Ed.2d 629 (1984)); *In re Washington Post Co.*, 807 F.2d at 390. *But see Wilson v. American Motors Corp.*, 759 F.2d at 1570–71 (adopting common law basis for right of access but applying the stricter first amendment requirement that secrecy " 'is necessitated by a compelling governmental interest, and is narrowly tailored to that interest.' ") (quoting *Globe Newspaper Co.*, 457 U.S. at 606–67 n. 14, 102 S.Ct. at 2619 n. 4).

In most cases, there may be little difference between a common law and constitutional right of access. Both ensure a presumption of access and permit a court to bar disclosure only when the specific interests favoring secrecy outweigh the general and specific interests favoring disclosure. However, the constitutional standard invokes the traditional first amendment test: that the reasons militating against disclosure must amount to compelling state interests before they may outweigh the right of access, and, further, that courts must resort to the means least restrictive of access. A constitutional analysis thus tilts the scale strongly in favor of the single interest of public access as against opposing interests that are also important in their own right. Furthermore, the constitutionalization of the right to pretrial records could freeze the law in this area of only recent first amendment development beyond the reach of modification by either legislative act or court rule.

■ In sum, we feel constrained to follow precedent from the Supreme Court and this jurisdiction in resting a presumptive public right of access to pretrial court records in civil litigation [8] on common law considerations.

This common law right of access, however, is not absolute. *See infra* Part V. Moreover, the right does not necessarily apply to all documents that one might ar-

---

**7.** Also to be noted is that the appellate standard of review under a common law test is whether the trial court abused its discretion, while the constitutional standard of review would be more stringent. *In re Washington Post Co.*, 807 F.2d at 390.

**8.** We deal here with ordinary civil litigation and our discussion relates only to such cases. We have previously recognized that different considerations are present in court proceedings of a type not having such a tradition of openness. *See Morgan v. Foretich*, 521 A.2d at 252 (Family Division proceedings).

guably term "court records" relating to a lawsuit. In this case, therefore, we must determine whether the presumptive right of access applies to: (a) depositions, interrogatories, and documents obtained in discovery but neither submitted as evidence at trial nor filed in connection with motions to the court; (b) motions relating to the discovery process, such as Miller's motion to amend the protective orders in the present case, the defendants' opposition to this motion, and the Associations' oppositions to motions to compel discovery; and (c) the Associations' oppositions to Miller's motions for a continuance and for amendment of the *ad damnum* clause of her complaint.

### B.

■ With the first class of documents, we have no problem whatever. Even under our colleague's view that a first amendment analysis is required, which we assume for purposes of the following discussion, no right of access exists to such documents. No court of record has extended the public right of access to pretrial depositions, interrogatories, and documents gained through discovery. And, indeed, several courts have expressly ruled that, because "pretrial depositions and interrogatories are not public components of a civil trial," *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17 (1984) (footnote omitted), the public has no common law or constitutional right of

access to discovery materials as such, that is, to discovery materials that neither side has introduced as evidence at trial or as documentation in support of trial papers or motions to the court.[9] "[T]here is no independent right of access by nonparties to materials produced in discovery and not made part of the public record." *In re "Agent Orange" Product Liability Litigation,* 96 F.R.D. 582, 584 (E.D.N.Y.1983); *accord, Anderson,* 805 F.2d at 13 (finding no presumptive right of public access to discovery materials under first amendment or common law); *see also Gannett Co. v. DePasquale,* 443 U.S. 368, 396, 99 S.Ct. 2898, 2914, 61 L.Ed.2d 608 (1979) (Burger, C.J., concurring) ("A pretrial deposition does not become part of a 'trial' until and unless the contents of the deposition are offered in evidence."); *Oklahoma Hospital Ass'n v. Oklahoma Publishing Co.,* 748 F.2d 1421, 1424–25 (10th Cir.1984), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985); *In re San Juan Star Co.,* 662 F.2d 108, 114–15 (1st Cir.1981); *Tavoulareas v. Washington Post Co.,* 111 F.R.D. 653 (D.D.C.1986). These decisions excluding discovery materials from public view find their justification both in the history of discovery procedures and, more significantly, in the purposes served by public scrutiny of judicial process, on the one hand, and by the discovery rules themselves, on the other.[10]

In order to put this caselaw into proper perspective, it is necessary to examine

**9.** Much discovery may be presumptively open to public view under statutory rules governing pretrial discovery, although neither the District of Columbia Superior Court Rules of Civil Procedure nor the Federal Rules of Civil Procedure specify whether the public may attend depositions or read deposition transcripts, interrogatory answers, or other discovery documents filed with the court. Both the local and federal rules make clear, however, that the trial court may order that discovery materials not be filed with the court, *see* Super.Ct.Civ.R. 5(d); Fed.R. Civ.P. 5(d), and may regulate the conditions under which depositions are taken when necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," Super.Ct.Civ.R. 26(c); Fed.R.Civ.P. 26(c). "Thus, to the extent that courthouse records could serve as a source of public information [about discovery materials], access to that source customarily is subject to the control

of the trial court." *Seattle Times Co. v. Rhinehart, supra,* 467 U.S. at 33 n. 19, 104 S.Ct. at 2207 n. 19. Moreover, the parties enjoy great freedom to modify discovery procedures by mutual consent. Super.Ct.Civ.R. 29; Fed.R.Civ.P. 29.

**10.** It is important to distinguish Mokhiber's claim of access to discovery materials from the established right of a party to disseminate information she has gained through discovery. As we discuss in detail below, Mokhiber cannot, as this case now stands, claim a right to have the protective orders removed by relying on Harriett Miller's own first amendment right to reveal what she learned through discovery before settling the case. The parties' right of dissemination is, therefore, irrelevant to this case. *See infra* pp. 1114–15.

more precisely the bases for a first amendment presumptive right of access to court proceedings (as assumed here). Such a presumption is founded on two grounds: one is the common-law history, the other is a matter of policy. As to the first, the public has traditionally enjoyed the right to inspect court documents. *See, e.g., Gannett,* 443 U.S. at 386 n. 15, 99 S.Ct. at 2908–09 n. 15 (observing that "[f]or many centuries, both civil and criminal trials have traditionally been open to the public"); *Nixon,* 435 U.S. at 597, 98 S.Ct. at 1311–12; *Publicker Industries,* 733 F.2d at 1066–70 (surveying judicial and historical authorities supporting existence of a common law right of access to civil as well as criminal proceedings); *Brown & Williamson,* 710 F.2d at 1177–79. In contrast, the courts have found no traditional right of access to discovery materials. "[R]estraints on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." *Seattle Times,* 467 U.S. at 33, 104 S.Ct. at 2208. Extensive discovery powers are of recent origin, *e.g., Anderson,* 805 F.2d at 12; 8 C. Wright & A. Miller, Federal Practice and Procedure §§ 2001 to 2002 (1970), and, to the extent that pretrial depositions and interrogatories were conducted prior to the discovery reforms of 1938, "[s]uch proceedings were not open to the public at common law," *Seattle Times,* 467 U.S. at 33, 104 S.Ct. at 2207–08. Thus, as distinguished from court records, there exists no common law tradition of access to discovery materials as such.

A justification for the right to view the results of modern discovery procedures might, however, be derived from the common law right to see court records generally. But such reasoning succeeds only if the traditional reasons behind the rule of access to other sorts of judicial records apply as well to the fruits of discovery. We therefore turn to the policy basis underlying any right of access under the first amendment: public scrutiny can serve to inform the public about the true nature of judicial proceedings, and public knowledge of the courts is essential to democratic government because it is essential to rational criticism and reform of the justice system. *See, e.g., Globe Newspaper Co.,* 457 U.S. at 604–06, 102 S.Ct. at 2618–19; *Publicker Industries,* 733 F.2d at 1068–69; *Brown & Williamson,* 710 F.2d at 1178–79. Publicity also can promote public confidence in the courts, where confidence is deserved, and often will inform people of opportunities for participation in the system that would otherwise pass unknown to many members of the public.

General access to discovery materials, however, will not promote these ideals of public scrutiny. By definition, discovered materials, as such, play no role in the courtroom or in the judge's decisionmaking. Depositions are normally filed in court, Super.Ct.Civ.R. 30(f), but, as with interrogatories and produced documents, unless the court sees them in the context of pleadings that incorporate particular discovery, only the parties view such materials, evaluate them, and reach decisions based on their contents. Indeed, "[m]uch of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action" and would ultimately prove inadmissible at trial. *Seattle Times,* 467 U.S. at 33, 104 S.Ct. at 2208; *see also Oklahoma Hospital Ass'n,* 748 F.2d at 1425; *In re San Juan Star,* 662 F.2d at 115. Public access to discovery materials, therefore, would focus attention not at all on the courts, but solely on the presumptively private affairs of the parties. Although the political significance of a particular dispute may strengthen the case for public access to court records in that litigation, *see, e.g., In re Coordinated Pretrial Proceedings,* 101 F.R.D. at 38, the right of access is grounded primarily in the need for scrutiny of the legal process, not simply in the public's desire to learn more about the deeds and misdeeds of the parties. Thus, a public right to view discovery materials has no greater foundation in the first amendment than would the bare claim by any member of the public that another person must answer questions and produce documents independent of a legitimate lawsuit and the legal processes it ensures.

The scope of pretrial discovery in civil cases is defined by court rules which are not constitutionally mandated. Not even a *bona fide* litigant has a first amendment right to the information discovery rules allow her to compel from her opponent. Much less does the public at large enjoy such a right.

Finally, a general right to see discovery materials not only would fail to serve the purposes underlying the right of access to judicial proceedings but also would undermine the discovery process itself. Because discovery typically requires the parties to produce information ultimately irrelevant to the suit and inadmissible at trial, a presumptive right of access by members of the public at large would create a greater burden on the privacy of litigants than does the publicity attending motions and trials. The threat of publicity about discovered information would pressure parties to fight disclosure more vigorously and would probably influence the courts supervising discovery to narrow the parties' access to information, thus vitiating the basic policy of liberal discovery. The parties, moreover, would certainly resist an outsider's intrusion even more strenuously than their opponents' efforts to obtain damaging evidence, and thus the courts would face intensified protective order litigation in any case potentially of interest to third parties. We hold, therefore, that there is no public right of access under the first amendment, let alone at common law, to discovery materials as such.

### C.

 Turning to the second class of documents Mokhiber seeks, we must decide whether he enjoys a presumptive right to see the Associations' oppositions to Miller's "motion to obtain access to material discovered in a foreign litigation" and motion to compel discovery, Miller's motion to amend the protective orders, and the Associations' opposition to that motion. Although Mokhiber sought access to all sealed documents, neither the trial court nor the parties distinguished the question of access to motions and opposition papers from the question of access to discovery materials.

We perceive an important difference between the two sorts of material and conclude, as a general matter, that the presumptive public right of access does apply to motions filed with the court concerning discovery, to evidence submitted with such motions—including materials produced during discovery—and to the court's dispositions, if any. By submitting pleadings and motions to the court for decision, one enters the public arena of courtroom proceedings and exposes oneself, as well as the opposing party, to the risk, though by no means the certainty, of public scrutiny. While there may be reasons why one party should not be permitted to force otherwise protectible discovery material into public view simply by attaching some of it to a motion lodged with the court, we believe, as elaborated below, that the presumptive right of access extends to all material that becomes germane to a court's ruling, in contrast with discovery material that neither party submits in evidence for consideration by the court. If discovery material submitted as evidence in connection with court pleadings is to be protected from public view, the party desiring secrecy must rebut the presumptive right of access.

We now can address, more specifically, the motions filed in connection with the discovery process. There is no common law tradition of access specifically directed to discovery hearings and to the pleadings submitted in connection with them. This absence, of course, is not surprising, for compelled discovery is a child of the first Federal Rules of Civil Procedure adopted in 1938. In *Gannett*, moreover, the Supreme Court observed that "there exists no persuasive evidence that at common law members of the public had any right to attend pretrial proceedings; indeed, there is substantial evidence to the contrary." 443 U.S. at 387, 99 S.Ct. at 2909 (footnote omitted). Although the Court was there concerned with pretrial hearings in a criminal, not a civil, case, it may be argued that the lack of a specific tradition of access to pretrial proceedings defeats any claim for a common law right of access to discovery

motions. *Cf. In re The Reporters Comm. for Freedom of the Press,* 249 U.S.App. D.C. 119, 125–26, 773 F.2d 1325, 1331 (1985) (asserting that first amendment right of access to judicial proceeding requires both a tradition of access and evidence that access to such proceeding "play[ ] an essential role in the proper functioning of the judicial process and the government as a whole").

We are not persuaded to apply such a highly restrictive approach. Modern discovery motions and court supervision of our elaborate discovery rules have no precise historical analogue. Although English law and federal law in America have long afforded litigants some ability to obtain depositions of witnesses and documents, these mechanisms were extremely narrow in scope; nor were state court procedures much more expansive, at least until the Field Code appeared in 1848. *Developments in the Law—Discovery,* 74 HARV.L. REV. 940, 946–51 (1961); 4 J. MOORE, J. LUCAS & G. GROTHER, MOORE'S FEDERAL PRACTICE § 26.03 (2d ed. 1986). As a result, discovery issues historically occupied a far less significant role in civil trials than they have recently assumed. Modern discovery rules have qualitatively altered the character of pretrial discovery and the demands it makes on the courts as well as on the parties. *See, e.g., Hickman v. Taylor,* 329 U.S. 495, 500–01, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947). It would make little sense to shut off access for what is, practically speaking, a new kind of judicial process just because that particular procedure did not exist at common law. Instead, the public should enjoy the right to view new kinds of proceedings when they are like traditional ones in this significant respect: that access will serve the same values and policies which underlie the common law's recognition of the public right to view other parts of court procedure and which, indeed, are similar to those values and policies upon which asserted first amendment rights are justified. In short, we do not view the common law right of access as one frozen in history but rather as one that, in the finest tradition of our jurispru-

dence, must reflect changes brought by the times.

The discovery process is clearly an important element of civil litigation. The manner in which it proceeds may prove decisive to the outcome of particular disputes, and the availability of mandatory discovery has greatly affected the way in which our courts do justice. Moreover, discovery procedures have become a continuing focus of controversy and reform within the judiciary and the legal community. This debate has arisen precisely because discovery is so important in trial practice. If we take as our standard "that the public's right of access attaches to decisions 'of major importance to the administration of justice,'" *Anderson,* 805 F.2d at 11 (quoting *In re Globe Newspaper,* 729 F.2d at 52), then discovery motions and hearings fall within the ambit of this right. We disagree with the view that "discovery proceedings are fundamentally different from proceedings to which the courts have recognized a public right of access." *Id.* at 12. Nor do we believe that "public access to the discovery process" cannot "play a significant role in the administration of justice," *id.,* except insofar as the "discovery process" includes the fruits of discovery rather than the manner in which the court manages discovery requests by the parties.

■■■■ Two of the discovery motions now under seal—Miller's motion to amend the protective orders and the Associations' opposition—were never ruled upon by the court; the parties settled the case before the court addressed Miller's motion. The public's interest in such documents may, nonetheless, remain strong. First, the presumptive right of access to pleadings attaches at the time documents are filed with the court. *See In re Continental Illinois Securities Litigation,* 732 F.2d at 1310; *In re Coordinated Pretrial Proceedings,* 101 F.R.D. at 42–43; *Publicker Industries, supra* (recognizing first amendment right to attend hearings on pretrial motions). *Contra, In re Reporters Comm. for Freedom of the Press,* 249 U.S.App.D.C. at 127–33, 773 F.2d at 1333–39 (holding there is no first amendment right of access to case

records until after judgment has been entered). Second, the court often plays an active role in the process that leads to settlement. A trial court, for example, may defer decision on given motions in light of its perception of the case and developing opportunities for settlement; thus, motions filed before a stipulated judgment may have a considerable effect on how a court manages a case toward settlement. Third, although the trial court does not generally scrutinize the terms of the parties' agreement, it may, as in this case, ratify the agreement by adopting its terms in a consent decree specifically enjoining the parties to perform their promises. In ratifying the agreement the court commits itself to enforce the agreement as it stands.[11] This decision, too, may be judged in light of the information available to the court at settlement, including pleadings pending before it. Accordingly, the fact that the parties have withdrawn the motions as part of a settlement may weigh in favor of retaining a protective order that seals them from public view, but it does not automatically void the presumptive right to see pleadings submitted for decision. *In re Continental Illinois Securities Litigation,* 732 F.2d at 1309–10.

### D.

Finally, the Associations' oppositions to Miller's motions for a continuance and amendment of the *ad damnum* clause of her complaint fall squarely within the presumptive right of public access. Both motions were considered and denied by the trial court before settlement. That they concern pretrial motions and do not go to the merits of the lawsuit creates no bar to public access. The concerns that underlie the right of access focus primarily on the justice system, not on the truth of a plaintiff's story as such; pretrial rulings may tell the public little about what actually happened to the parties and who ought to win, but they may reveal a great deal about the character of the judicial process.

Particularly in complex cases, pretrial rulings, like discovery orders, generally " 'play a significant role in the administration of justice.' " *Anderson,* 805 F.2d at 12. When a court's decision is subject to public scrutiny, the pleadings it considered in reaching its judgment must also be presumptively open to the public.

### IV.

Mokhiber, as a member of the public, thus enjoys a presumptive right of access to several of the documents under seal. This presumptive right extends to the motions and oppositions filed with the court, including their supporting exhibits. Like the public at large, however, Mokhiber enjoys no right of access to discovery materials held by the parties or under seal with the court. In light of these conclusions, we hold that Mokhiber has met the requirements for intervention of right to challenge the seals placed on the various motions and oppositions to which he has a presumptive right of access. But he does not have standing, and therefore cannot intervene, to challenge the protective orders or the seals as they pertain to discovery materials themselves.

### A.

Under Super.Ct.Civ.R. 24(a), the trial court must grant intervention to an applicant who "claims an interest relating to the property or transaction which is the subject of the action and ... is so situated that the disposition of the action may as a practical matter impair or impede his [or her] ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Mokhiber claims an interest—his presumptive right of access to some of the sealed documents—that is legally stifled by the continuing protective orders he seeks to challenge. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 96 F.R.D. at 583. It is equally obvious that the parties will not represent

11. The parties desire the court's backing because, once embodied in a consent decree, the settlement contract may be enforced by use of the contempt power and can be challenged only

on grounds of fraud, duress, or mistake in its creation. *See Sabatine v. Commonwealth,* 497 Pa. 453, 458, 442 A.2d 210, 212 (1981).

**1114** ■

this interest: CPG and the Associations oppose Mokhiber's claim, and even if Miller wishes Mokhiber success, she is barred by the consent decree from challenging the protective orders herself. The question remains, however, whether Mokhiber's interest is one "relating to the ... transaction which is the subject of the action" in which he seeks to intervene.

■ "The exact nature of the interest required to sustain a right to intervene has eluded a precise and authoritative judicial definition...." 3B J. MOORE & J. KENNEDY, MOORE'S FEDERAL PRACTICE § 24.07[2], at 24–37 (2d ed. 1987). Nevertheless, the federal courts have readily allowed intervention under FED.R.CIV.P. 24 solely for the purpose of challenging protective orders. For intervention as of right, an applicant's interest need not encompass the entire subject matter of a lawsuit; "the court should have the power to limit intervention to certain claims or defenses." *Id.* § 24.16[6], at 24.180 (footnote omitted). Nor has the fact that protective orders are incidental to the primary subject of the original suit stopped the courts from allowing third parties to intervene as of right to challenge such orders on their merits. *See e.g., Anderson,* 805 F.2d at 3–4; *In re Reporters Comm. for Freedom of the Press,* 249 U.S.App. D.C. at 121, 773 F.2d at 1327; *Palmieri v. New York,* 779 F.2d 861, 864 (2d Cir.1985) (permissive intervention); *In re San Juan Star, supra; In re Coordinated Pretrial Proceedings,* 101 F.R.D. at 37.[12] Moreover, FED.R.CIV.P. 24(a) does not by its terms require that an intervenor's interest bear on a question the parties actually dispute between themselves. Here, because an outsider asserts a right independent of the claims of the original parties, an agree-

ment between those litigants not to dispute the continued secrecy of court records should be irrelevant to the applicant's right to challenge such an agreement. *Cf. In re Knoxville News–Sentinel Co.,* 723 F.2d 470, 471 (6th Cir.1983) (third parties intervened immediately following *ex parte* entry of protective order); *LaRouche v. Federal Bureau of Investigation,* 677 F.2d 256, 257–58 (2d Cir.1982) (allowing intervention as of right for Freedom of Information Act challenge to protective order entered by consent of parties). Thus, on the facts presented here, we can perceive no ground for denying Mokhiber intervention as of right to challenge the seals remaining on those documents to which he shares with the public a presumptive right of access.

### B.

Even though a party may intervene to challenge one aspect of an action or decision, he or she "may not have standing to challenge the whole of it...." *Hobson v. Hansen,* 44 F.R.D. 18, 25 (D.D.C.1968) (Wright, J.). Just as one must have standing to initiate a lawsuit, an applicant for intervention must at least have standing to challenge the action evoking concern: here, Mokhiber must assert not just any interest, but a "legally protectable" interest in the subject-matter of the underlying dispute. *Southern Christian Leadership Conference (SCLC) v. Kelley,* 241 U.S.App.D.C. 340, 342, 747 F.2d 777, 779 (1984) (as amended) (citing *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971)); *see also United States v. Chesapeake & Potomac Telephone Co.,* 418 A.2d 114, 116 (D.C.1980) (stating that "the would-be intervenor must

**12.** *In re Franklin Nat'l Bank Securities Litigation,* 92 F.R.D. 468 (E.D.N.Y.1981), *aff'd sub nom. Federal Deposit Ins. Corp. v. Ernst & Ernst,* 677 F.2d 230 (2d Cir.1982), may be a contrary case on this point. The intervenors had originally filed a claim under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1982), since one party to the settlement was the Federal Deposit Insurance Corporation, a federal agency. When their FOIA claim failed, they sought access to the settlement agreement through the court that had approved it. The intervenors apparently continued to base their claim of ac-

cess on FOIA, not on the common law or the Constitution, and the court recognized the FOIA claim as providing a presumptive right of access to the agreement. Without stating precisely why it reached this conclusion, the court held that the applicants had "no 'significantly protectable interest' in the main litigation sufficient to support intervention as of right." 92 F.R.D. at 471 (quoting *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971)). The court nevertheless granted permissive intervention. *Id.*

be a person 'aggrieved' by the decision [he or she] seeks to challenge"). Mokhiber, however, has no legal claim to view the discovery materials that have not been submitted to the court as evidence or exhibits. He therefore has no standing to attack the protective orders or the seals as they pertain to discovery materials, and thus the trial court properly denied intervention to lift or modify these protective orders or the continued secrecy of discovered documents now under seal. *See SCLC,* 241 U.S.App. D.C. at 342–44, 747 F.2d at 779–81.

Mokhiber cannot rely on any first amendment right Miller may have to disseminate information she has gained during discovery. Compulsory discovery procedures "are a matter of legislative grace," or common law, and a litigant, like the public, "has no First Amendment right of access to information made available only for purposes of trying his suit," *Seattle Times,* 467 U.S. at 32, 104 S.Ct. at 2207. It may be that a third party sometimes has standing to challenge a protective order blocking a party's right to reveal discovered information. *See Martindell v. International Telephone & Telegraph Corp.,* 594 F.2d 291, 294 (2d Cir.1979) (stating that because one party would release depositions to government but for protective order, government has standing to challenge order as improperly entered). Mokhiber, however, has shown no factual basis for relying on Miller's constitutional right to discuss the case with him. In particular, he has not shown that, but for the protective order, Miller would disclose any discovered document she still controls, if any exists. Moreover, given Miller's contractual obligation to adhere to the terms of the protective orders, it appears unlikely she would release information to Mokhiber. *See Oklahoma Hospital Ass'n,* 748 F.2d at 1424–25.

## V.

We turn, finally, to the policies favoring and disfavoring disclosure in a particular case and to the procedures for establishing access and for rebutting the presumptive right. We begin with the authoritative Supreme Court teaching on the subject in *Nixon,* 435 U.S. at 598–99, 98 S.Ct. at 1312–13:

> It is uncontested however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.... It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.

Although it is not possible to list exhaustively the reasons that militate for and against disclosure in specific cases, some common factors that trial courts should consider in exercising their "sound discretion" deserve mention here. First, courts have long recognized that information of certain kinds may be more readily closed from public view, such as commercial and national security secrets and information that seriously invades the privacy of third parties or would merely promote libel or scandal. *Nixon,* 435 U.S. at 598, 98 S.Ct. at 1312; *Publicker Industries,* 733 F.2d at 1070–71; *Brown & Williamson,* 710 F.2d at 1179–80; *In re Application of National Broadcasting Co.,* 209 U.S.App. D.C. 354, 364–65, 653 F.2d 609, 619–20 (1981). Material that falls into one of these classes may be screened from public access on a showing of good cause to believe disclosure would create specific harms of the kind sought to be avoided by giving that sort of information greater protections. *Anderson,* 805 F.2d at 7; *Publicker Industries,* 733 F.2d at 1071.[13] But outside

---

**13.** We have recently held that a civil contempt hearing in a child custody case also presents

special concerns that justify closure to the public on a less stringent standard than might

these limited classes of information, a more open-ended inquiry is needed to determine whether there are reasons for closure that outweigh the interests favoring access.

■ Generally speaking, factors counseling against disclosure in civil cases include the need to ensure a fair trial, the need to obtain the cooperation of witnesses and other sources of information, and the inequity of exposing parties or witnesses who acted in reliance on continuing confidentiality. *See Gannett,* 443 U.S. at 387–91, 99 S.Ct. at 2909–11; *Palmieri,* 779 F.2d at 864–66; *In re Knoxville News–Sentinel,* 723 F.2d at 477; *Martindell,* 594 F.2d at 295.[14]

■ Two aspects of the present case are of particular significance here. First, the existence of the settlement agreement, which included a provision for maintaining the protective orders and the secrecy of sealed documents, must play a central role in weighing the interests favoring continued secrecy. As the trial court observed, a prior settlement agreement is generally an important factor weighing against disclosure when continued secrecy was a significant condition of reaching settlement. In

*In re Franklin Nat'l Bank Securities Litigation,* Judge Weinstein reasoned:

> The settlement agreement resulted in the payment of substantial amounts of money and induced substantial changes of position by many parties in reliance on the condition of secrecy. For the court to induce such acts and then to decline to support the parties in their reliance would work an injustice on these litigants and make future settlements predicated upon confidentiality less likely.

92 F.R.D. at 472.

■ We do not, however, adopt a position that, "[i]n the name of encouraging settlements, . . . would have us countenance what are essentially secret judicial proceedings." *Hotel Rittenhouse,* 800 F.2d at 345. We decline to adopt a *per se* rule that protective orders, once properly entered, cannot be lifted absent "extraordinary circumstance[s]" or "compelling need," for such restrictive standards reverse the presumption to favor secrecy over access. *See Palmieri,* 779 F.2d at 864–65.[15] Yet we recognize that protective orders typically induce reliance by the parties and often constitute a significant inducement to settlement. The parties' re-

usually apply to hearings in civil cases. *Morgan v. Foretich,* 521 A.2d 248.

**14.** In some circumstances, full disclosure of a discovery motion or exhibits submitted with it may defeat the purpose of that motion. Suppose, for example, that a party files a motion for summary judgment, attaching as exhibits materials produced by the opposing party during discovery, and that the opposing party then moves for a protective order. Or suppose, simply, that a party files a motion for a protective order in connection with producing materials sought during discovery and that, as part of the motion, the movant describes the contents of discovery materials he or she wants sealed or attaches such materials in support of the motion. Full disclosure of the motion or supporting documents could undermine or destroy the utility of the protective order, whether disclosure was sought at the time of the motion or sometime after it was entered. In such a case, the state's interest in protecting a party or third person "from annoyance, embarrassment, oppression, or undue burden or expense," Super. Ct.Civ.R. 26(c), may constitute an interest sufficient to justify not only granting the protective order itself but also sealing the motion seeking the order (or opposing it) and any supporting documents. A court asked to keep a discovery

motion secret should consider whether redacting appropriate portions of the motion or exhibits would accomplish the purpose before suppressing the entire motion. In the present case, it appears that neither the sealed pretrial motions and oppositions, nor any of the exhibits attached to them, contain discovery materials subject, independently, to the court's protective orders.

**15.** A party seeking to lift an existing protective order may always challenge the order on the ground that it was improperly granted at the time it was entered. *Palmieri v. New York,* 779 F.2d at 865 (stating that "no amount of official encouragement and reliance [on a protective order] could substantiate an unquestioning adherence to an order improvidently granted"). A protective order is improperly granted if when it was entered there existed no "good cause" for the order according to the standards of Super.Ct.Civ.R. 26(c). However, it is quite proper for the trial court to place upon the attacking party the burden of showing that no such "good cause" in fact existed; that is, the presumption in favor of the correctness of trial court actions is operative.

liance on secrecy and the goal of encouraging settlement, therefore, very frequently will constitute a compelling reason to continue an existing protective order.

■ To accommodate these various interests, we conclude that, by invoking the common law right of access, the party seeking to lift the protective order will establish a prima facie case that secrecy is unjustified; the party opposing the motion, however, may cite a properly entered protective order to meet the initial burden of production to show there is a countervailing interest that outweighs the interest favoring public access. The movant then must produce evidence to show why, in the particular case, the opponent's interest in secrecy is not sufficiently strong to outweigh the interests behind disclosure. Thus, in practice, the presumption favoring access to court records provides a member of the public standing to challenge an existing protective order, but he or she must carry the burden of producing evidence sufficient to convince the court that, on the facts of the particular case, the interests favoring continued secrecy do not outweigh the interests favoring disclosure. A person seeking access may argue that the protective order was not an essential element of a settlement agreement, that the parties' initial reasons for desiring secrecy are no longer present (that is, the protective order has become an anachronism), or that the parties' interest in secrecy is simply weaker than the public interest in disclosure. In each case, the trial court must consider whether maintaining a permanent protective order was, or likely was, an essential element in reaching settlement and, then, consider what harm the parties in fact would suffer from disclosure at the time a third party seeks access. This harm, if any, must then be weighed against the interests recommending disclosure.

■ We turn to the second aspect of this case that will deserve scrutiny: the public or professional significance of the lawsuit at issue. A claim to access is bolstered when the materials sought will shed light on events of historical or contemporary interest to a wider audience; an issue of greater and wider public importance may create a stronger claim of access than a less important issue. The primary public interest, moreover, may relate to the underlying dispute, not to the judicial proceedings, as such, in which the records arose. Thus, for example, the Supreme Court noted in *Nixon,* 435 U.S. at 602, 98 S.Ct. at 1314, that the interests weighing in favor of disclosing the Watergate tapes were not only "the presumption ... in favor of public access to judicial records" but also the "incremental gain in public understanding of an immensely important historical occurrence." *See also Brown & Williamson,* 710 F.2d at 1180–81; *Newman,* 696 F.2d at 801. While judicial process should not be used solely to expose previously private matters, the significance of events that become entangled with the judicial system, and the system's response, can become indistinguishable from the significance of the system itself.

## VI.

In conclusion, we hold that the trial court properly denied Mokhiber's application to intervene insofar as he sought to challenge the protective orders and the seals placed on certain discovered documents that were never submitted to the court in connection with pleadings. We reverse the denial of intervention insofar as Mokhiber sought to challenge the sealing and continued confidentiality of papers submitted to the court for decision, including exhibits submitted in support of such papers. On remand, if Mokhiber indicates that he wishes to pursue his claim of access to the latter group of documents, the trial court should exercise its sound discretion in evaluating the claims for and against disclosure according to the criteria discussed herein.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

FERREN, Associate Judge, concurring in part and dissenting in part:

I join in the disposition and in the opinion of the court, except in one respect. I be-

lieve the presumptive public right of access to pretrial records of civil judicial proceedings is premised on the first amendment, not merely on the common law. Thus, unlike my colleagues, I believe the public right of access is presumptively stronger than any competing consideration favoring secrecy. I conclude, accordingly, that presumptive access can be rebutted only by a showing that a compelling governmental interest necessitates secrecy and that the protective order sealing the pretrial records is narrowly tailored to serve that interest.

## I.

I agree with the majority that, "[i]n most cases, there may be little difference between a common law and constitutional right of access." *Ante* at 1108.[1] But I believe the first amendment, unlike the common law, guarantees public protection against a risk that my colleagues apparently are willing to invite: "modification" of "the right to pretrial records ... by either legislative act or court rule." *Ante* at 1108. The difference between a common law and first amendment right of access, therefore, is important not only because "a common law right is more easily overcome by reasons favoring secrecy," *ante* at 1108, but also because the legislature, and even the court, can amend—indeed, repeal—common law protection.

## A.

In exploring the constitutional issue, I begin with the Supreme Court case, on which the majority primarily relies, concerning access to tangible evidence in a criminal trial. According to my colleagues, in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d

570 (1978), "the Supreme Court recognized the presumptive right of access to court records as one based on the common law." *Ante* at 1106. That statement is somewhat misleading. The Court did recognize a common law right of access to court records but did not, in addition, indicate the first amendment was inapplicable. *See In re Reporters Committee for Freedom of the Press,* 249 U.S.App.D.C. 119, 126, 773 F.2d 1325, 1332 (1985) (*Nixon* "did not reach the First Amendment issue"). What happened in *Nixon* was this: The Court rejected respondents' effort to obtain release of certain White House tapes from the federal district court where they had been admitted into evidence at the criminal trial of some of President Nixon's former advisers. But the Court did not squarely apply the common law. Rather than "weighing the interests" for and against access under the common law, 435 U.S. at 602, 98 S.Ct. at 1314, the Court deferred to an administrative procedure Congress had established for screening presidential tapes and documents, with a view to making those of historical value eventually accessible to the public. In effect, the Court ruled that this procedure preempted any common law right of access which the Court might otherwise apply.

The Court in *Nixon* then rejected respondents' argument that they had a first amendment right of physical access to the tapes, for purposes of copying for broadcast and sale to the public. In doing so, however, as my colleagues acknowledge, *ante* at 1106 n. 2, the Court stressed that the press had been "permitted to listen to the tapes and report on what was heard." 435 U.S. at 609, 98 S.Ct. at 1318. Indeed, reporters had been furnished "transcripts

1. Both the common law and the first amendment assure a strong presumption of access and permit a court to bar disclosure only when the interests favoring secrecy clearly outweigh the interests favoring disclosure. The constitutional standard, of course, adds two requirements for overcoming the presumption: the order denying access must be "necessitated by a compelling governmental interest, and ... narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982). (Interestingly, at least one court has incorporated this constitutional standard into the common law analysis. *Wilson v. American Motors Corp.,* 759 F.2d 1568, 1570–71 (11th Cir.1985)). On the other hand, the requirement of a compelling state interest may make little practical difference, since the grounds on which court rules permit the entry of protective orders—avoiding "annoyance, embarrassment, oppression, or undue burden or expense"—can, when acute, provide compelling reasons for a carefully circumscribed protective order. *See* Super.Ct.Civ.R. 26(c) (1987).

of the tapes, which they were free to comment upon and publish." *Id.* Accordingly, "[t]he contents of the tapes were given wide publicity by all elements of the media. There is no question of a truncated flow of information to the public." *Id.* The Court then noted that "[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public," and added that the public "has never had *physical* access" to the White House tapes. *Id.* (Emphasis in original.) Implicit, therefore, was a ruling that the critical first amendment issue—information flow—was not an issue in the case. Had the press never had informational access to the tapes, the constitutional ruling (if not the common law analysis) might have been different. In sum, the Court's rejection of the first amendment argument in *Nixon* focused essentially on a claimed right of access for commercial, not informational, purposes and does not affect a case, such as appellant Mokhiber's, where the right of access to judicial records has been altogether stifled.

### B.

In the relevant cases, the Supreme Court has extended the constitutional right of access. I believe these decisions, all in criminal cases, presage a presumptive first amendment right of public access to pretrial court records in civil cases as well.

In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed. 2d 973 (1980) (plurality opinion), Chief Justice Burger addressed an objection by the press to a state trial court order closing a criminal trial to the public at the defendant's request, without objection by the prosecutor. The Chief Justice said that "[f]ree speech carries with it some freedom to listen" and noted, accordingly, that " '[i]n a variety of contexts this Court has referred to a First Amendment right to "receive information and ideas." ' " *Id.* at 576, 100 S.Ct. at 2827 (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972)). He then summarized:

What this means in the context of trials is that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing court room doors *which had long been open to the public at the time the Amendment was adopted.*

*Richmond Newspapers,* 448 U.S. at 576, 100 S.Ct. at 2827 (emphasis added).

Two years later, in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court considered a Massachusetts statute construed to require exclusion of the press and the public from a criminal trial during the testimony of a minor victim of a sex offense. Speaking through Justice Brennan, the Court held that the statute violated the first amendment, since a "mandatory closure rule" was not narrowly tailored to serve a compelling governmental interest. *Id.* at 608, 102 S.Ct. at 2621 (emphasis omitted). In reaffirming the teaching of *Richmond Newspapers* that the public has a first amendment right of access to criminal trials, Justice Brennan stressed, once again, that "the criminal trial historically has been open to the press and public." *Globe Newspaper,* 457 U.S. at 605, 102 S.Ct. at 2619. He then applied a second, policy factor inherent in first amendment analysis: the right of access to criminal trials is significant to the proper "functioning of the judicial process and the government as a whole." *Id.* at 606, 102 S.Ct. at 2619. Justice Brennan elaborated that public scrutiny "enhances the quality and safeguards the integrity of the factfinding process," heightens "public respect for the judicial process" by fostering "an appearance of fairness," and thereby "permits the public to participate in and serve as a check upon the judicial process—an essential component of our structure of self-government." *Id.* (footnotes omitted). In sum, the first amendment protects the right of access to criminal trials because such access not only reflects historical tradition but also advances an important public purpose. *See In re Washington Post Co.,* 807 F.2d 383, 389 (4th Cir.1986); *In re Reporters Committee for Freedom of the Press,* 249 U.S.App.D.C. at 125, 773 F.2d at 1331.

The Supreme Court continued this trend by confirming a presumptive first amendment right of access to pretrial criminal proceedings in *Press–Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*) (preliminary hearing).[2] Moreover, even before *Press–Enterprise II*, the United States Court of Appeals for the Ninth Circuit in *Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983), relied on *Nixon* and *Globe Newspaper* in holding that the first amendment right of access also presumptively applies not only to pretrial criminal proceedings but also to documents filed in such proceedings.

*Richmond Newspapers, Globe Newspaper, Press–Enterprise II*, and *Associated Press*, of course, concerned the first amendment right of access to criminal court whereas the present case is civil. Furthermore, the three Supreme Court decisions dealt only with access to court proceedings, not to court records as in this case. I believe, however, that the historical and policy reasons for the first amendment right of access to criminal court proceedings also dictate a constitutional, not merely a common law, basis for the asserted right of access to civil proceedings, including pretrial court records—the issue to which I now turn.

### II.

In holding that "the right to attend criminal trials is implicit in the guarantees of the First Amendment," 448 U.S. at 580, 100 S.Ct. at 2829, Chief Justice Burger in *Richmond Newspapers* added a significant footnote: "Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials

have been presumptively open." *Id.* n. 17. In a concurring opinion, moreover, Justice Stewart stressed that the first amendment "clearly give[s] the press and the public a right of access to trials themselves, civil as well as criminal." 448 U.S. at 599, 100 S.Ct. at 2839 (footnote omitted). Members of the Supreme Court, therefore, have recognized in dicta that, as a matter of legal history—and perhaps of first amendment jurisprudence—the courts have been, and accordingly must be, as open for public observation of civil proceedings as for criminal cases.

A few years later, in *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir.1984), the United States Court of Appeals for the Third Circuit applied the reasoning of *Richmond Newspapers* and *Globe Newspaper* in squarely holding that the public and the press have a first amendment right of access to civil trials and, thereafter, to the trial transcripts. *See also Wilson v. American Motors Corp.*, 759 F.2d 1568, 1570–71 (11th Cir. 1985) (applying common law right of access to trial record of civil action settled mid-trial, but incorporating "compelling governmental interest" test from *Globe Newspaper* into abuse of discretion standard of review).

Furthermore, as a matter of history—of common law—the public right of access has been extended to civil court records:

[A]ny attempt to maintain secrecy, as to the records of the court, would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access, and to its records, according to long established usage and practice.

In *National Broadcasting Co., Inc. v. Presser*, 828 F.2d 340 (6th Cir.1987), the United States Court of Appeals for the Sixth Circuit applied *Press–Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*) to confirm a qualified first amendment right of access in a criminal case to pretrial proceedings inquiring into a motion for judicial disqualification and into alleged attorney conflicts of interest.

---

**2.** In *Press–Enterprise v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*), the Court had extended the presumptive right of access under the first amendment to jury *voir dire* in a criminal proceeding. The Court added that, if an overriding governmental interest in preserving secrecy is found, that "interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 510, 104 S.Ct. at 824.

*Ex Parte Drawbaugh,* 2 App.D.C. 404, 407–08 (1894) (civil appeal of patent case). Indeed, the Supreme Court in *Nixon,* citing *Drawbaugh* among other cases, said "[i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon,* 435 U.S. at 597, 98 S.Ct. at 1312 (footnote omitted).

At least two federal courts of appeal, moreover, have constitutionalized these rulings, holding that the first amendment guarantees presumptive public access to documents filed in civil litigation. *Brown & Williamson Tobacco Corp. v. Federal Trade Commission,* 710 F.2d 1165, 1179 (6th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984) (documents filed by FTC in administrative proceeding against tobacco company); *In re Continental Securities Litigation,* 732 F.2d 1302, 1308 (7th Cir.1984) (report of special litigation committee prepared in connection with shareholders' derivative action).

In extending the constitutional right of access to civil litigation, however, the courts have not always clearly distinguished between access to trials; access to pretrial records of cases awaiting trial; and post-trial access to pretrial records,[3] trial exhibits, and pretrial and trial transcripts. In *In re Reporters Committee for Freedom of the Press,* 249 U.S.App.D.C. at 127–32, 773 F.2d at 1333–38, the United States Court of Appeals for the District of Columbia Circuit sharply distinguished between access to records while a case is pending and thereafter. Citing *Drawbaugh, supra,* among other cases, a divided panel of the court rejected the argument that the first amendment created a presumptive right of access to court records *"before* judgment rather than *after."* 249 U.S.App.D.C. at 131, 773 F.2d at 1337 (emphasis in original). Speaking for the majority, Judge Scalia noted the absence of historical authority

for pre-judgment access to records of private civil cases and thus concluded there was insufficient precedent "to justify the pronouncement of a *constitutional rule* preventing federal courts and the states from treating the records of private civil actions as private matters until trial or judgment." 249 U.S.App.D.C. at 130, 773 F.2d at 1336. Judge Scalia also found insufficient constitutional policy grounds for pre-judgment access to civil court records. 249 U.S.App.D.C. at 130–31, 773 F.2d at 1336–37. Judge Wright filed a meticulous dissenting opinion to the contrary. He concluded that "a review of common law precedent suggests a presumptive right of contemporaneous access to the records of civil proceedings." 249 U.S.App.D.C. at 145, 773 F.2d at 1351. He then limited his discussion of the standard applicable under the first amendment to the type of protective order at issue: an order "provisional[ly]" sealing court records until completion of the trial. 249 U.S.App.D.C. at 148–49, 773 F.2d at 1354–55. Judge Wright concluded that an intermediate standard for justifying secrecy—a " 'substantial' government interest"—would suffice in lieu of the strict standard requiring a compelling or overriding governmental interest in most first amendment contexts. 249 U.S.App.D.C. at 149, 773 F.2d at 1355.

In the instant case, of course, the issue is access to pretrial court records *after* the judgment (based on the settlement). Thus, even the majority view in *In re Reporters Committee for Freedom of the Press* does not preclude a constitutional right of access in Mokhiber's case. In addressing this issue, however, my colleagues treat the matter more broadly, concluding that the "right of access to pleadings attaches at the time documents are filed with the court," *ante* at 1112. Thus, once an item is filed, this court does not make timing of the request for access—pretrial, at-trial, or post-trial—a factor in determining whether

---

**3.** The only pretrial records at issue here are those filed with the court for purposes of scrutiny in connection with pretrial motions, including those for summary judgment. Unfiled discovery materials, which have not effectively

been admitted for evidentiary purposes, are not within the scope of a presumptive right of access to records of civil cases. *See Seattle Times v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

the requesting party has a presumptive right to the documents asked for.

In contrast, however, perhaps my colleagues should be understood to emphasize the timing factor in their adoption of a common law, rather than a first amendment, right of access; their heavy focus on an asserted lack of public interest in "pretrial" records is evident. *Ante* at 1108. On the other hand, there is no positive indication the majority would perceive a first amendment right of access if the issue were limited, as the facts here would allow, to post-judgment access to pretrial records.[4]

My own view is that a presumptive first amendment right of public access to pretrial records in civil litigation attaches upon filing, pretrial, as Judge Wright has demonstrated, but that a compelling governmental interest is as necessary to justify a provisional protective order limiting access to the period after judgment as it is to justify a more far-reaching protective order barring access indefinitely, as I develop more fully below.

### III.

Having summarized the caselaw development, I want to explicate more precisely the policy reasons for extending the constitutional right of access to civil litigation and, specifically, to pretrial records.

Clearly, the first amendment right of access to criminal proceedings incorporates the common law tradition; as Justice Brennan has written, the Constitution in this respect "carries the gloss of history"—"a tradition of accessibility." *Globe Newspaper*, 457 U.S. at 605, 102 S.Ct. at 2619 (quoting *Richmond Newspapers*, 448 U.S. at 589, 100 S.Ct. at 2834 (Brennan, J., concurring in judgment)). Chief Justice Burger's dicta in *Richmond Newspapers* reflects the same traditional access to civil proceedings. One could reasonably argue, therefore, that the first amendment has constitutionalized the common law itself and, thereby, added heightened scrutiny to protect the traditional right of access to both criminal and civil litigation. The matter is not that simple, however, for, as noted earlier, in discussing the right of access to criminal trials the Supreme Court has found first amendment protection not only because of history but also as a matter of policy—the importance of public scrutiny. The question, then, is whether the purposes underlying the presumptive right of access to criminal proceedings are sufficiently applicable to civil proceedings and court records for first amendment protection to attach.

The answer is yes; there is the same need for public scrutiny of civil litigation as for criminal. One may be less moved, initially, to defend public access to a private dispute over a commercial real estate contract, for example, than to a sensational murder trial; but, when the differences between civil and criminal proceedings are probed, the public interest in scrutiny of these two categories is not materially different. *See Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179 ("policy considerations discussed in *Richmond Newspapers* apply to civil as well as criminal cases"). A real estate dispute may include issues of historical preservation, or of demolition of scarce low-income housing, or of significant zoning changes—all of considerable public import. Or a civil matter may reflect alleged fraud that could have criminal, not merely civil, implications. Indeed, civil cases of virtually every kind "frequently involve issues crucial to the public—for example, discrimination, voting rights, antitrust issues, government regulation, bankruptcy." *Id.* I therefore cannot agree with my colleagues' statement that "[t]he public interest in preliminary sparring between two parties protected by the adversary system is significantly different from the public interest in preliminary criminal

---

4. The majority implicitly leaves open the possibility of a first amendment right of post-judgment access to *trial* documents and transcripts in civil cases. The distinction between pretrial and trial records becomes fuzzy when a court

rules on motions for summary judgment. I would define the latter as records filed with the court and cited or obviously considered as a basis for decision.

proceedings." *Ante* at 1108.[5]

Nor do I believe the standard of scrutiny should be different if civil pretrial, instead of trial, proceedings are at issue. There may be reasons why a provisional pretrial or prejudgment protective order is indicated, in contrast with a post-judgment protective order; but, given the important policy reasons for public access to civil litigation, I do not see why less than a compelling governmental interest should be required to justify the protective order at any stage of the proceeding. Obviously, there may be reasons that justify a provisional, prejudgment protective order that would not remain after the case was over. Or there may be records filed pretrial, in contrast with exhibits admitted at trial, that could survive a protective order after judgment. But there is no way one can say for sure that a particular category of court records will be less usefully scrutinized than another, given the purposes justifying public access. It appears to me, therefore, that the differences in outcome—protective order or no protective order—should turn on the facts of each case, influenced by the stage of the proceeding when the document is filed (*e.g.*, pretrial) and when access is sought (*e.g.*, post-judgment); but I perceive no basis for saying that the standard for scrutinizing the requested access should vary with the different types of documents involved or with the different times for seeking access.

Similarly, I perceive no reason why the standard of scrutiny should differ if the question is access to civil court records in contrast with attendance at court proceedings. There is no meaningful difference between the two; indeed, "court records often provide important, sometimes the only, bases or explanations for a court's decision." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1177.

In sum, for both historical and policy reasons, the presumptive right of public access to civil trials and court records is no less protected by the first amendment than is access to criminal proceedings. Accordingly, following most of the federal courts that have addressed the issue. as my colleagues acknowledge, *ante* at 1107 n. 4, I would remand for consideration of Mokhiber's presumptive right of access under the first amendment test: whether the sealing of the pretrial motions and oppositions (in contrast with the discovery materials as such) under the protective order "is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 607, 102 S.Ct. at 2620.

---

**5.** It is possible, of course, to have purely private disputes, but these, like all others, are not immune from the benefits of a public watchdog. In any event, it would not be feasible to identify, and apply different access rules to, civil cases that do and do not reflect a public interest.