V.K., Petitioner,

v.

CHILD AND FAMILY SERVICES
AGENCY of the District of
Columbia, Respondent.

No. 08–AA–1105.

District of Columbia Court of Appeals.

Argued Jan. 5, 2011.
Decided Feb. 17, 2011.

Michael O'Keefe for petitioner.

Mary L. Wilson, Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before FISHER, THOMPSON and OBERLY, Associate Judges.

THOMPSON, Associate Judge:

Petitioner V.K. challenges the decision of a District of Columbia Child and Family Services Agency (the "Agency" or "CFSA") hearing officer upholding the Agency's decision to place his name on the District of Columbia Child Protection Register, a "confidential index of cases of abused and neglected children."[1] Under the limited review that we are authorized to undertake in this case, we conclude that we must affirm the decision of the hearing officer.

## I.

CFSA is required by law to maintain a Child Protection Register (the "Register"), which must include, for each "substantiated" or "inconclusive" report of child abuse or neglect, "the identity of the person responsible for the abuse or neglect." D.C.Code §§ 4–1321.03(b)(3) and 4–1302.02(a)(2) (2001).[2] Access to information contained in the Register is available to specified law enforcement and child welfare agencies. *See id.* § 4–1302.03(a). The statute also provides that access to some information contained in substantiated reports of child abuse shall be given to the "chief executive officers or directors of day care centers, schools, or any public or private organizations working directly with children, for the purpose of making employment decisions regarding employees and volunteers or prospective employees and volunteers" upon a request that is "made in writing and clearly articulates the basis for the request," and that "is accompanied by a notarized consent for

---

1. D.C.Code § 4–1302.01(b)(1) (2001). Among the purposes of the Register are to "[a]ssist in the identification and treatment of abused and neglected children and their families" and to "[s]erve as a resource for the evaluation, management, and planning of programs and services for abused and neglected children." *Id.* § 4–1302.01(b)(2)–(3).

2. A "substantiated report" is one that is "supported by credible evidence and is not against the weight of the evidence." D.C.Code § 4–1301.02(19A) (2001). A report of abuse is "inconclusive" if it "cannot be proven to be either substantiated or unfounded." *Id.* § 4–1301.02(13A). A report is unfounded if it was "made maliciously or in bad faith or ... has no basis in fact." *Id.* § 4–1301.02(20A).

release of information from the Child Protection Register signed by the employee or volunteer or prospective employee or volunteer." *Id.* § 4–1302.03(a–1)(1).

A person who is identified in the Register as responsible for the abuse of a child is entitled to a fair hearing at which he may "challenge information which he or she alleges is incorrect or establish that a report is unfounded." *Id.* § 4–1302.06; *see also id.* § 4–1302.05(b)(3) and 29 DCMR § 5903.2 (2002). At a fair hearing, the appellant and CFSA may call and examine witnesses, cross-examine opposing witnesses, introduce documentary evidence, and submit rebuttal evidence. 29 DCMR § 5909.4. "CFSA shall bear the burden of proof by a preponderance of the evidence at any fair hearing." *Id.* § 5909.7. "An appellant who is aggrieved by the Hearing Officer's decision may seek judicial review before the District of Columbia Court of Appeals in accordance with the contested case provisions of the District of Columbia's Administrative Procedure Act, D.C.Code § 2–510." *Id.* § 5911.1. CFSA is required to expunge from the Register "[a]ny material successfully challenged as incorrect." D.C.Code § 4–1302.07(c)(2). However, "[n]otwithstanding any other provision of law, substantiated reports shall not be expunged from the Child Protection Register." *Id.* § 4–1302.07(a).

## II.

On June 12, 2007, CFSA notified petitioner that it had entered his name into the Register on the basis of an investigation (by CFSA social worker Brian Brown) that substantiated allegations that petitioner had abused his (then thirteen-year-old) son E.K. by hitting him.[3] After an informal review[4] did not resolve the matter, a CFSA hearing officer presided over a fair hearing on March 18, 2008. At the hearing, CFSA presented the testimony of social worker Brown and introduced photographs of scars on E.K.'s body that the child said were the result of his father's disciplining him by hitting him with a cord or other object. Petitioner testified and denied any recent use of corporal discipline and also presented testimony by one of E.K.'s former teachers and two family friends. After the hearing, the hearing officer issued an April 18, 2008 Decision and Order in which she upheld CFSA's decision and ordered that "[p]etitioner's name shall remain in the Child Protection Registry." Petitioner filed exceptions to the decision. In a July 4, 2008 Decision and Order, the hearing officer declined to disturb her ruling. This petition for review followed.

Petitioner contends (1) that the hearing officer's decision was not supported by substantial evidence; (2) that the hearing officer erred as a matter of law in finding that petitioner abused E.K. through physical discipline; and (3) that the hearing officer erred in denying his request, made at the time he filed exceptions to the April 18, 2008 decision, to supplement the record.

---

**3.** As a result of his investigation, Brown reported "[n]o signs of present danger" and stated that "[b]ased on currently available information," petitioner's children were "not likely to be in immediate danger of serious harm." Brown recommended "services and family monitoring." As far as the record discloses, the Agency's determination of substantiated abuse did not result in any effort to remove the children from the home, any neglect proceeding in Family Court, or any criminal charge.

**4.** CFSA regulations mandate that the "Program Administrator" or his or her designee "review every request for a fair hearing in an attempt to resolve the issues informally." 29 DCMR § 5906.1. This informal review is to include a meeting with the appellant and/or his or her representatives. *Id.* § 5906.2.

## III.

We can dispose quickly of petitioner's second and third contentions; the first merits a more extensive discussion.

■ The hearing officer sustained the charge of abuse upon finding that petitioner caused injuries to E.K. through inappropriate physical discipline. Petitioner argues that, in so doing, the hearing officer erred as a matter of law, because she failed to consider "what . . . circumstances may have been present if and when physical discipline was employed." Petitioner emphasizes that whether the force used in disciplining a child is unreasonable or excessive depends on, *inter alia*, the "gravity of the offense for which the child is being punished," and that the hearing officer made no findings about the reason(s) for the discipline that purportedly caused the scars on E.K.'s body. Petitioner is correct (and, at oral argument, counsel for CFSA acknowledged) that the relevant statutory provisions do not dictate that physical discipline of a child of E.K.'s age that causes injury is unreasonable *per se* or necessarily constitutes abuse.[5] Nevertheless, this court has viewed as at least "a close question" whether hitting a child with a belt "harshly and with some regularity when she was disobedient" constitutes excessive corporal punishment. *In re A.B.*, 999 A.2d 36, 46–47 (D.C.2010) (reasoning that "[t]he use of an object such as a belt is not necessarily excessive, but it certainly is a 'relevant' consideration"). We also recognized in *A.B.* that "from [what the court found was] the falsity of [the parent's] denial that he had hit [the child] at all," the court could infer the absence of extenuating circumstances that justified severe punishment, *id.* at 47—an observation that is apropos here as well. In light of our reasoning in *A.B.*, we cannot say that the hearing officer erred as a matter of law when—having concluded that it was more likely than not that petitioner repeatedly hit and injured E.K. with a cord or other instrument—she treated that discipline as excessive.

■ We likewise reject petitioner's claim that the hearing officer erred by declining his request to supplement the record. Petitioner sought to include in the record the explanations he provided to CFSA during the informal review (attended by social worker Brown and CFSA's counsel) about the origin of E.K.'s scars, explanations that petitioner asserts he had assumed would be a part of the fair hearing record.[6] We reject this claim of error

---

5. The statute provides that the term "abused," "when used with reference to a child, means: the infliction of physical or mental injury upon a child," D.C.Code § 16–2301(23)(A)(i) (2001), but the term "does not include discipline administered by a parent" if "the discipline is reasonable in manner and moderate in degree and otherwise does not constitute cruelty." *Id.* § 16–2301(23)(B)(i). The term "discipline" does not include "non-accidental injury to a child under the age of 18 months," and likewise does not include "burning, biting or cutting a child," "striking a child with a closed fist," "inflicting injury to a child by shaking, kicking or throwing the child," "interfering with a child's breathing," or "threatening a child with a dangerous weapon or using such a weapon on a child."

*Id.* § 16–2301(23)(B)(i)(I)–(VI). But the statute does not categorically exclude as "discipline" a parent's infliction of physical injury upon a child over the age of 18 months by hitting the child. Nor does the statute mandate that such discipline always be considered unreasonable, immoderate or abusive, without regard to factors such as the reason for the discipline. *Cf. In re L.D.H.*, 776 A.2d 570, 575 (D.C.2001) ("[C]ourts examining the issue of corporal punishment by parents generally agree that it must be reasonable under the facts and circumstances of the case.").

6. Possibly, the basis for petitioner's expectation was the CFSA regulation that provides that the Program Administrator shall notify the Office of Fair Hearings of the results of

as foreclosed by CFSA regulations. Section 5909.6 of Title 29 of the District of Columbia Municipal Regulations provides that "[t]he recording, exhibits, all papers, requests, and other documents filed in the proceedings, the decision, and the findings and conclusions constitute the exclusive record of the fair hearing." Section 5910.7 of Title 29 provides that a petitioner's "exceptions and any responses shall be reviewed solely on the basis of the fair hearing record compiled pursuant to section 5908.4 [referring to the case record and document and witnesses presented in support of the appeal]" and that the hearing officer "*may not receive any additional evidence, testimony, or witnesses*" (emphasis added).

### IV.

 In this case, as in other cases governed by the contested case provisions of the District of Columbia Administrative Procedure Act, D.C.Code § 2–510 (2001), we must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Providence Hosp. v. District of Columbia Dep't of Emp't Servs.*, 855 A.2d 1108, 1111 (D.C.2004); *see also* D.C.Code § 2–510(a)(3)(A) (2001). If an agency decision is otherwise in accordance with law—a matter we review *de novo*[7]—we will not disturb the decision if it "rationally flows from the facts relied upon, and those facts or findings are substantially supported by the evidence of record." *Jadallah v. District of Columbia Dep't of Emp't Servs.*, 476 A.2d 671, 675 (D.C.1984); *see also Compton v. District of Columbia Bd. of Psychology*, 858 A.2d 470, 475 (D.C.2004) (recognizing that all administrative decisions are subject to this convention); 29 DCMR § 5910.4 (providing that the hearing officer's decision must contain findings of fact and conclusions of law and be supported by "reliable, probative, and substantial evidence"). The requirement of "substantial evidence in the record means more than a mere scintilla," *Jadallah*, 476 A.2d at 676 (internal quotations and citations omitted), and refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Compton*, 858 A.2d at 476.

 Here, the law required the hearing officer to determine *de novo*[8] whether the

---

the Program Administrator's informal review. *See* 29 DCMR § 5906.3. Petitioner asserts that during the informal review, he offered the following explanations for E.K.'s injuries depicted in photographs taken by Brown: The scar on E.K.'s lower back was caused by E.K.'s sister, S.K., who placed a ruler on the floor behind E.K.'s back while the two were competing at sit-ups; the ruler dug into E.K.'s back when he lowered himself onto it. The injuries on E.K.'s legs were scrapes caused by playing soccer without shin guards, falling while "rock hopping," and scratching after coming into contact with poison ivy. The mark on E.K.'s left arm was the result of an accident in 2002 when E.K. was helping his father remove plaster with wire mesh from the walls. The scrape on E.K.'s face was "broken skin he sustained from a fall while playing flag foot ball [*sic*] on the school field," an injury that was re-aggravated when "he brushed against it while he was being disciplined" years ago.

7. *See Providence Hosp.*, 855 A.2d at 1111.

8. The statute does not state explicitly that a fair hearing related to the Child Protection Register must be a *de novo* hearing, but that is the implication of the mandate that it be an evidentiary hearing at which an appellant can seek to show that information in the Register is incorrect. *Cf. In re Bushey–Combs*, 160 Vt. 326, 628 A.2d 541, 542 (1993) (reasoning that statutory guarantee of evidentiary fair hearing would be meaningless if review board was limited to determining whether agency had sufficient evidence when it decided to list an individual on its sexual abuse registry, and therefore concluding that the hearing was to be a *de novo* hearing). The regulation mandating that the hearing officer's decision in-

report that petitioner abused E.K. by hitting him was "substantiated"—*i.e.,* was "supported by credible evidence and . . . not against the weight of the evidence."[9] D.C.Code § 4–1301.02(19A). At the hearing, CFSA bore the burden of proof by a preponderance of the evidence.[10] 29 DCMR § 5909.7. Our task in turn is to determine whether the hearing officer's conclusion on that issue is supported by substantial evidence in the record. This means that "we will disturb the administrative finding [by the hearing officer] only if the record compels a contrary conclusion." *Handoko v. Attorney General of the United States,* 260 Fed.Appx. 519, 525 (3d Cir.2008) (explaining the meaning of a review for substantial evidence); *see also Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.,* 992 A.2d 1276, 1282–83 & n. 5 (D.C.2010) (explaining that "we will decide

whether there is substantial evidence to support the agency's decision . . . by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole" and that when an agency decides whether the party with the burden of proof met that burden, we will reverse that determination "only if the record compels a contrary conclusion to the exclusion of any other inference" (citations and internal quotation marks omitted)).

 We can agree with petitioner that the evidence of whether he abused E.K. by using excessive physical discipline was far from one-sided (and, if our role were to decide the issue *de novo,* we might well conclude, at least with respect to some of the allegations of abuse, that CFSA did not meet its burden of proof of showing "substantiated abuse"). To begin with,

clude "conclusions upon each contested issue of fact" likewise implies that the hearing is to be *de novo.* 29 DCMR § 5910.4(b) (2002).

**9.** This comports with the statutory mandate that, "[n]otwithstanding any other provision of law," a "substantiated" report of abuse "shall not be expunged." D.C.Code § 4–1302.07(a).

**10.** Thus, the hearing officer's task was to determine by a preponderance of the evidence whether a conclusion of "abuse" was against the weight of the evidence—a type of charge with which adjudicative bodies have long been familiar. *See, e.g., C.M. Moderwell & Co. v. Farmers Grain & Feed Co.,* 174 Ill.App. 535 (Ill.App.Ct.1912) ("[W]e cannot say that it is shown by a preponderance of the evidence that . . . the verdict and judgment are manifestly against the weight of the evidence").

Although the panel expressed some concern at oral argument about whether the hearing officer applied the correct standard, we ultimately are satisfied that she did. Our concern was based on several passages in her initial decision. There, for example, she identified the issue to be resolved as "[w]hether sufficient evidence exists to support the Agen-

cy's determination of substantiated child abuse" (and, consistent with that statement of the issue presented, in announcing her conclusions of law, she declared "that the Agency's determination of substantiated abuse is supported by the record" and that "[s]ufficient evidence exists to support the Agency's finding of substantiated child abuse"). In referring to "sufficient evidence," she did not mention the "preponderance of the evidence" standard. Moreover, declaring that the Agency's determination was supported by the record is not the same thing as announcing that the hearing officer was persuaded, by a preponderance of the evidence, that the report of abuse was substantiated.

However, the hearing officer clarified in her July 4, 2008 Decision that her finding on the issue presented was that "[t]otal evidence of record established that the child *more likely than not* was injured as a result of [p]etitioner's physical discipline" (emphasis added). *Cf. Haley v. United States,* 799 A.2d 1201, 1209 n. 6 (D.C.2002) ("The preponderance of the evidence standard requires proof that something more likely than not exists or occurred."). This statement demonstrates that the hearing officer understood that, to be sufficient, the Agency's evidence had to preponderate.

CFSA relied exclusively on hearsay testimony by social worker Brown that petitioner's children J.K. and E.K. reported that E.K. bore scars on his body as a result of physical discipline by petitioner, and on double hearsay testimony that one of E.K.'s teachers told Brown that E.K. reported that his cheek was injured when petitioner disciplined the child.[11] Of course, hearsay is admissible in an administrative hearing and "may constitute substantial evidence." *Compton*, 858 A.2d at 476 (recognizing that "nothing in the hearsay nature of evidence inherently excludes it from the concept of 'substantial' proof in administrative proceedings"); *see also James v. District of Columbia Dep't of Emp't Servs.*, 632 A.2d 395, 398 (D.C.1993) (noting that we "have not . . . mechanically rejected agency findings for lack of substantial evidence whenever the finding was based mainly, or even entirely, on hearsay evidence contradicted by sworn testimony"). In addition, "[c]hild abuse cases pose unique problems of proof" that would make a "categorical[ ] bar [against] the hearsay testimony of the child victim" particularly inappropriate. *A.Y. v. Commonwealth*, 537 Pa. 116, 641 A.2d 1148, 1152 (1994); *see also In re Jam.J.*, 825 A.2d 902, 911 (D.C.2003) (recognizing the emotional impact on children from testifying in abuse and neglect proceedings). But it is "quite another thing to say that the direct sworn testimony of a witness on a crucial fact [here, petitioner's testimony that he did not physically discipline his teenaged children] can be effectively refuted by hearsay, *i.e.*, the statements of persons not produced as witnesses . . . ." *Jadallah*, 476 A.2d at 676. We have admonished repeatedly that "when the party relying on hearsay statements is in a position to call the declarants to the stand," *id.*, "the practice of relying exclusively on hearsay . . . should be heavily weighted against the sponsoring party." [12] *Compton*, 858 A.2d at 479; *see also In re Jam.J.*, 825 A.2d at 915 n. 7 ("[r]eliance on uncorroborated (or weakly corroborated) child hearsay that is not tested by cross-examination to prove charges of abuse poses well-known risks of unfairness"); *cf. A.Y.*, 641 A.2d at 1152 (reversing agency decision to place appellant's name on a statewide abuse registry where agency relied only on "its own employees' recitation of what [a] three-year old child stated had occurred").

Second, it was undisputed that, at the time of Brown's investigation, petitioner's children bore some jealousy and anger against petitioner because of his relationship with the children of his girlfriend (Ms. A.),[13] and thus possibly had an incentive or motive to fabricate allegations about petitioner. J.K. also admitted to Brown that in the past the children's mother (petitioner's estranged wife) had encouraged the children to make false allegations (of sexu-

---

11. CFSA also offered into evidence the graphic photographs that Brown took of the scars on E.K.'s body. Without the hearsay testimony, however, the photographs were probative only of the location and nature of E.K.'s injuries, not their source.

12. If, as CFSA's counsel represented at oral argument, the Agency has no ability to compel a child's attendance at a fair hearing, that limitation could affect how heavily an exclusive reliance on hearsay should be "weighted against" the Agency. That said, the hearing transcript shows that S.K. (who reportedly told Brown that petitioner "spanks her on the hand but she is not hurt") was present at the hearing—raising a question about whether she might have been called to testify regarding whether she had witnessed petitioner physically disciplining E.K. and whether she had any knowledge about the origin of E.K.'s scars.

13. Brown wrote in his report that J.K. told him that "she feels that her father treats his girlfriend's children better that [*sic* ] he treats her and her siblings."

al abuse) against petitioner, and petitioner testified that the mother had had renewed contact with the children despite a court order requiring that she contact them only through supervised visits, and was continuing to "caus[e] ... trouble." Petitioner further testified without contradiction that in 2006 or 2007, the children came under the influence of their half-sister (the daughter of petitioner's estranged wife), who was resentful of petitioner because of her (erroneous) perception that she had been placed into an independent living program because petitioner did not want her in his home. Ms. A. and longtime family friend Ms. V. similarly testified about negative changes in the children that they had witnessed after the children's interactions with the half-sister, and about their belief that J.K. and E.K. may have fabricated allegations against petitioner with the encouragement of their half-sister. The foregoing evidence affects the weight that could be accorded to much of CFSA's hearsay evidence, because "factors to consider in evaluating the reliability of hearsay evidence [include] whether the declarant is biased." *Compton,* 858 A.2d at 478.

Third, Brown acknowledged during his testimony that petitioner told him that S.K. "may have done that [*i.e.,* caused injury to E.K.'s back] while he was doing sit ups," and conceded that he did not include that explanation in his investigative report. CFSA also presented no evidence that it investigated that explanation, an

omission that detracts from the weight of the Agency's evidence about the injuries to E.K.'s back.[14] *Cf. DeSousa v. Department of Social Servs.,* No. 95–3768, 1996 WL 1251377, *2, 1996 Mass.Super. LEXIS 574, *6–7 (Mass.Super.Ct.1996) (reasoning, in case challenging listing of petitioner on state's child sexual abuse registry, that where the investigator did not do a follow-up investigation into the explanations offered by the petitioner, the facts gathered by the investigator did not provide reasonable cause to support the allegations of sexual abuse).

Fourth, Brown testified that E.K. told him that the injuries to his arm, leg, and back were caused by petitioner's hitting him with a cord.[15] However, CFSA did not present medical testimony that the scars were consistent with E.K.'s having been hit with a cord,[16] and the hearing officer agreed with petitioner's counsel that Brown had "not been qualified to provide expert testimony" on the issue of "what type of injury is the result of what." We take notice that the scars shown in the photographs that were admitted differ quite markedly from each other (*e.g.,* scars from broken skin on the back and arm, but areas of discoloration on the legs), and none seems consistent with the descriptions of injuries from beatings with a cord contained in reported decisions and juvenile justice literature of which we are aware.[17]

---

**14.** The Agency does not dispute that, during the informal review in late 2007, petitioner offered the explanations for E.K.'s injuries described in note 6, *supra.* Nothing in the record suggests that CFSA conducted a follow-up investigation regarding any of those explanations.

**15.** Brown explained that in his written report of his interview with E.K., he "transposed" the words "wire" and "cord," and that E.K. actually reported being hit with a "cord."

**16.** We note in addition that Brown's report indicates that he requested E.K.'s medical records, but CFSA presented no evidence that any physician had ever made note of E.K.'s scars as cause to suspect physical abuse.

**17.** *See, e.g., In re J.A.,* 601 A.2d 69, 72 (D.C. 1991) ("The officer also testified that, in her experience, a beating with an extension cord causes a loop-shaped mark."); *State v. Kimberly B.,* 283 Wis.2d 731, 699 N.W.2d 641, 646 (App.2005) (citing testimony by police sergeant that loop marks on child indicated

In addition, a former teacher (Mr. N.) testified that E.K. is "very active," would "dive" off of desks and tables and jump down six steps at a time, and repeatedly got in trouble for climbing a barbed wire fence.[18] Petitioner gave similar testimony about E.K.'s roughhousing, explaining that "[s]ometimes we call him ... crash dummy" because he "will take unnecessary risk." Thus, there was evidence from which the hearing officer could have inferred that E.K.'s physical activities accounted for scars on his body.

In short, if the hearing officer had concluded on this record that CFSA failed to show by a preponderance of the evidence that the charge of child abuse was substantiated, we would likely have had little difficulty affirming that conclusion as one supported by substantial evidence in the record. Can we say, however, that the record compelled the hearing officer to reach that conclusion—*i.e.*, to conclude that CFSA's position that the report of abuse was "substantiated" was "contrary to the overwhelming weight of the evidence in the record as a whole?" We cannot. Several factors lead us to this conclusion.

First, petitioner testified that since his children "are grown now," he disciplines them through "loss of privileges." Significantly however, when interviewed by Brown, petitioner acknowledged using physical discipline in the past (stating to Brown "that he has not physically disciplined his children in years"). The record contains no more precise statement from petitioner about when he stopped employing corporal discipline. E.K. told Brown that the injury on his cheek, which (as the hearing officer observed) is "clearly visible" in the photograph taken by Brown, "happened ... two years ago" when petitioner "hit him in the face with an instrument," and E.K.'s teacher, Ms. M., told Brown that she observed that injury on E.K.'s face two years before she was interviewed by Brown. The Child Protection Register statute does not establish a date limitation with regard to incidents that warrant an entry in the Register,[19] and the hearing officer, who specifically cited petitioner's acknowledgment of having "physically disciplin[ed] his children although he stated that he has not done so for years," could reasonably infer that the reportedly

that she had likely been struck with an extension cord or belt); *State v. Williams*, 24 S.W.3d 101, 120 (Mo.App.W.D.2000) (citing testimony by pediatric-emergency doctor that " 'loop mark' injuries are pathognomonic of child abuse" and that " 'little thin objects like belts or little whips or electrical cords' cause loop marks when they are struck against a person"); *Portable Guides to Investigating Child Abuse*, DEPARTMENT OF JUSTICE OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, http://www.ncjrs.gov/html/ojjdp/portable_guides/abuse/bruises.html (last visited January 20, 2011) (explaining that cords leave *bruises* in either parallel or single lines).

18. Mr. N., who taught E.K. in third and fifth grades and coached him in basketball, testified that he never noticed any marks or scars on E.K. that caused him to suspect physical abuse.

19. Somewhat to the contrary, CFSA staff may be required to retain in the Register, for many years, even inconclusive reports of abuse. *See* D.C.Code § 4–1302.07(b) (2001) (directing that staff "shall expunge from each inconclusive report all information that identifies any person in the inconclusive report upon the first occurrence of either: (1) The 18th birthday of the child who is the subject of the report, if there is no reasonable suspicion or evidence that another child living in the same household or under the care of the same parent, guardian, or custodian has been abused or neglected; or (2) The end of the 5th year after the termination of the social rehabilitation services directed toward the abuse and neglect").

years-old injury to E.K.'s cheek was evidence of abuse.[20]

Second, although the timing of J.K.'s original report of abuse to her teacher (made, according to Brown's report, when J.K. was being tested to rule out academic issues) and the timing of J.K.'s and E.K.'s explanations to Brown (which were contemporaneous with the jealousy and family tensions already discussed) suggest that the reports may reflect bias, Ms. M.'s report to Brown was that E.K. told her much earlier (i.e., apparently before the children had the motives to fabricate described above) that the mark on his cheek "came from his father disciplining him."[21] Thus, CFSA presented hearsay evidence of a statement whose timing, the hearing officer could reasonably conclude, suggested that it was reliable (notwithstanding its nature as double hearsay).

Third, Brown wrote in his report that when he interviewed petitioner in his home, the only explanation that petitioner offered when asked about marks on E.K.'s body was that any marks on his son must be from E.K.'s mother. In his testimony at the hearing, Brown acknowledged that, when interviewed, petitioner had also mentioned S.K.'s having caused an injury to E.K.'s back while the children were doing sit-ups. During petitioner's testimony, however, when asked whether he had known E.K. to sustain any injuries in the home, petitioner mentioned only E.K.'s twisting his ankle "doing kick boxing and stuff like that" and "little, little bruises and scrapes." As the hearing officer found, at the hearing, petitioner "provided little or no specific information as to how the child's injuries occurred," mentioning none of the specific explanations that he (apparently) had mentioned during the informal review and that he set out in his exceptions, and offering no explanation for the five-inch scar across E.K.'s back (which was hardly a "little, little ... scrape[ ]"). Thus, petitioner gave "shifting" and "non-specific" answers, James v. District of Columbia Dep't of Emp't Servs., 632 A.2d 395, 399 (D.C.1993), providing a basis for the hearing officer to discount his credibility[22] and to accord greater weight to the "aggregation" of consistent hearsay reports to the contrary. Id. at 398.

The foregoing, along with the other evidence of record, is enough for us to conclude that the evidence did not compel the hearing officer to conclude that the charge of "substantiated" abuse was unsupported by credible evidence or against the weight of the evidence. We hold therefore that the hearing officer's decision was sup-

---

20. Even if the hearing officer had considered and credited petitioner's post-hearing assertion that the injury on E.K.'s cheek was "re-aggravated" when the boy's face brushed against something while he was being disciplined, she might reasonably have regarded physical discipline that caused E.K.'s face to brush against something so forcefully as to "re-aggravate" a wound as excessive physical discipline.

We do not necessarily suggest that (and we need not decide whether) a single act of corporal discipline that produced the mark on E.K.'s face by itself would constitute abuse. Cf. In re S.K., 564 A.2d 1382, 1390 (D.C.1989) (Schwelb, J., concurring in part and dissenting in part) (explaining that although "a single act, if sufficiently drastic, could constitute abuse within the meaning of our statute," "[m]ost cases of physical chastisement in which abuse or neglect has been found ... involve [a] ... continuous pattern of mistreatment").

21. According to Brown's report, Ms. M. stated that J.K. also reported that petitioner "used to physically discipline her, but she never saw any evidence of the abuse."

22. The hearing officer was "unpersuaded that the allegations [of abuse] were falsely made."

ported by substantial evidence, and, accordingly, it is hereby

*Affirmed.*