*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CV-1331, 14-CV-1387, & 15-CV-585

J.C., ET AL., APPELLANTS,

and

WP COMPANY, LLC, INTERVENOR,

v.

DISTRICT OF COLUMBIA, ET AL., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2010-CAB-6550)

(Hon. John M. Mott, Trial Judge)

(Argued June 21, 2016                    Decided December 27, 2018)

*Gregory S. Smith* for appellants.

*A. Joshua Podoll*, with whom *Kevin T. Baine* was on the brief, for intervenor.

*Loren L. AliKhan*, Deputy Solicitor General at the time of argument, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time of argument, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] and GLICKMAN and MCLEESE, *Associate Judges*.

PER CURIAM:  In 2007, the District of Columbia[1] filed a child abuse and neglect complaint against the parents of twin eight-month-old infant girls. The District of Columbia ("District"), removed the twins, N.C. and Jo.C.[2], from their parents' home, based on a Children's National Medical Center physician's report that one of the twins, N.C., may have suffered from shaken baby syndrome.  The children were returned to their parents after approximately fourteen days.  The abuse and neglect case against the parents was ultimately withdrawn.

The parents, J.C. (mother) and G.C. (father) ("the C.s"), filed a civil suit against the District contending that the District's removal of their children violated their constitutional rights.  In their civil suit, the C.s allege 42 U.S.C. § 1983 (2006) claims and common law tort claims against the District and against

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of oral argument.  Her status changed to Chief Judge on March 18, 2017.

[1] Specifically, the District of Columbia was the named defendant below because its agencies, the Child and Family Services Agency and the Office of the Attorney General, investigated and prosecuted the allegations of child abuse, respectively.

[2] Jo.C. is referred to in the record as "J.C.," but because she shares the same initials as her mother, we refer to her as "Jo.C."

individual District employees within the District of Columbia Office of the Attorney General and the Child and Family Services Agency ("CFSA"). The trial court granted summary judgment in favor of the District on all of the parents' claims, concluding that the District was not subject to liability because it was entitled to qualified immunity on the § 1983 claims and sovereign immunity on the common law tort claims. The trial court also granted the District's motion to dismiss the individual defendants.[3] *See* Super. Ct. Civ. R. 12 (b)(6). The C.s appeal those decisions.

Consolidated with the C.s' appeal are intervenor WP Company LLC's ("Washington Post") appeals of the trial court's decisions denying its motions seeking access to (1) the summary judgment pleadings, which were sealed and not made available to the public; and (2) an unredacted copy of the trial court's summary judgment order. The trial court ordered most of the record sealed because the case was closely intertwined with the earlier child abuse and neglect action, a confidential matter by statute. *See* D.C. Code §§ 16-2331, -2332, and 4-

---

[3] The C.s filed suit against the individual government employees who were involved in the child abuse and neglect case, specifically CFSA Investigator Roberta Geheren, Assistant Attorney General Jason H. Lederstein, Acting Deputy Attorney General of the Family Division Sara E. Gold, and General Counsel for CFSA Donald B. Terrell.

1303.06 (2012 Repl.); Super. Ct. Civ. R. 5-III (standard for sealing court documents).

We have found this case to be of exceptional difficulty both factually and legally, and we recognize the challenges that the trial court faced in answering the questions present in this case. Nevertheless, on the record before us, we are unable to determine whether summary judgment in favor of the District was appropriate. Specifically, the trial court did not directly address whether any of the District's actions actually violated the C.s' constitutional rights in rejecting the C.s' § 1983 claims.[4] Likewise, the trial court did not adequately explain why the District and the individual defendants were entitled to immunity from the C.s' common law tort claims. Therefore, we remand for the trial court to consider these issues in determining whether to grant the District's motion for summary judgment and in dismissing the individual defendants.

However, under this court's de novo standard of review, and the record as it currently stands, we are able to make the following legal conclusions. First, we hold that the District had probable cause to believe that both N.C. and Jo.C. were

---

[4] For the reasons explained *infra*, we disagree with the trial court's conclusion that there was no material issue of fact that none of the District's actions in this case were a result of a governmental policy.

in imminent danger of child abuse based on Dr. Allison Jackson's assessment that N.C. suffered from unexplained symptoms consistent with shaken baby syndrome. Second, we hold that the District did not violate the C.s' due process rights by including them on the Child Protection Register. Third, we also affirm *infra* some of the ancillary constitutional claims that the C.s raise and conclude that: (1) the District did not violate the C.s' substantive due process rights; (2) the two-week separation of N.C. and Jo.C. from their parents was not greater than necessary; and (3) the C.s' equal protection rights were not violated.

We remand for the trial court to address in the first instance the following questions that we believe are crucial to resolving the remainder of the C.s' appeal: (1) whether there were exigent circumstances justifying the warrantless seizure of Jo.C. from the parental home;[5] (2) whether probable cause to retain custody of N.C. and Jo.C. continued to exist after Dr. Jackson issued her second medical report; and (3) whether the undisputed facts demonstrate that both the District and the individual defendants were entitled to immunity on the common law tort claims.

---

[5] In answering this question, we ask that the trial court consider whether there is a material question of fact as to how much time elapsed between the medical hold of N.C. at the hospital and the seizure of Jo.C. from the parental home. We also ask the trial court to consider whether there exists a CFSA policy to seize suspected abused children from homes without a warrant.

With regard to the Washington Post's appeals, we remand for the the trial court to explain its decision to seal the summary judgment pleadings in their entirety and its reasoning for making its redactions to the summary judgment order.[6]

## I. Factual and Procedural Background

To summarize, on August 31, 2007, Children's National Medical Center ("Children's National") contacted CFSA for suspected child abuse after the C.s brought in then-eight-month-old N.C. for vomiting, retching, and acting uncharacteristically irritable. N.C. was diagnosed with old and new bleeding in the front left region of her head (subdural hematoma), along with "retinal hemorrhages" in both eyes. Dr. Allison Jackson, consulting physician of

---

[6] The trial court's redacted order was issued on August 3, 2016, after oral arguments in this case were held. Our publication of this opinion may potentially reveal confidential information contained within the summary judgment pleadings and order, which the trial court had ordered sealed. However, this court's governing rules expressly state that "[i]n any . . . appeal noted from a case in which the record has been sealed by the Superior Court, *the record alone will be filed under seal*; any filings in this court in such appeals will be placed under seal *only upon order of this court*." D.C. App. R. 12 (c) (emphasis added). In order to protect the privacy of the minor children and parents in this case we substitute appellants' names with their initials, as we do in all other "(1) juvenile, (2) adoption, (3) parentage, or (4) neglect proceedings." *Id.* We believe our rules adequately protect the privacy interests of the parties involved while allowing this court to render effective guidance.

Children's National's Child and Adolescent Protection Center, found the retinal hemorrhages suspicious and wrote that they were "most consistent with inflicted head trauma with the most likely mechanism being that of shaking with or without impact," i.e., injuries consistent with "shaken baby syndrome." Dr. Jackson further noted that the mother's explanation for N.C.'s injuries, that N.C. fell while playing on the hardwood floor, "could not explain the retinal hemorrhages."

CFSA Investigator Roberta Geheren placed a "medical hold" on N.C. at Children's National pending further testing and also ordered the emergency removal of the second twin, Jo.C., from the C.s' home. At about 1:00 a.m. on September 1st, Jo.C. was removed from the C.s' custody by CFSA without a warrant, with help from the Metropolitan Police Department ("MPD"). The record is unclear as to how many hours passed between when CFSA placed N.C. in a medical hold and when CFSA went to secure Jo.C. from the C.s' home. On September 3rd, Judge Zoe Bush held an initial emergency hearing and determined that CFSA had probable cause to remove and hold both children based on Dr. Jackson's report of her medical examination of N.C. suggesting that the trauma was "most likely" the result of "shaking."

On September 4th, and following an MRI of N.C., Dr. Jackson opined in a second medical-legal report that, while N.C.'s subdural hematoma injuries "may be consistent with the explanation given by" J.C., J.C.'s explanation did not explain N.C.'s retinal hemorrhages, so "inflicted head trauma remains a possibility" and that "[l]ab tests completed to date demonstrate no other medical explanations for the retinal hemorrhage." The District thereafter served the C.s with petitions alleging abuse and neglect of N.C. and Jo.C., respectively, signed by Investigator Geheren and Assistant Attorney General Jason Lederstein, the prosecutor assigned to the case.

Magistrate Judge Mary Grace Rook conducted a supplemental probable cause hearing on September 10th, 11th, and 13th, and ruled on the 14th. Dr. Jackson testified on behalf of the District and adhered to her opinion that the retinal hemorrhages were injuries consistent with shaken baby syndrome and could not be explained by what J.C. told the hospital. Dr. Ronald Uscinski, the parents' expert witness, testified that vomiting could, indeed, have caused the retinal hemorrhages and opined further that it "would not be possible to shake [N.C.] causing retinal hemorrhages without other trauma." Magistrate Judge Rook concluded that both Dr. Jackson and Dr. Uscinski were credible witnesses, but found more credible Dr. Uscinski's explanation that the "prolonged vomiting (four

hours) could have . . . caused the retinal hemorrhages." Accordingly, Magistrate Judge Rook concluded that there was no probable cause to believe that N.C. was abused. The children were returned to the C.s' custody fourteen days after they were initially removed. About one month later, on December 14, 2007, the C.s were notified that their names had been automatically placed onto the District of Columbia's Child Protection Register because of the District's "inconclusive" report regarding N.C.'s abuse allegations. The C.s filed an administrative appeal of that decision and their case was heard before a hearing examiner, who ordered the C.s' names removed from the Register on July 22, 2008.

On August 30, 2010, the C.s filed suit against the District and the individual government employees involved in their child abuse and neglect prosecution, asserting injuries resulting from the alleged unlawful government seizure of their children. They asserted violations of the Fourth and Fifth Amendments[7] pursuant to § 1983 by the District, and common law tort claims against both the District and individual defendants: negligence and gross negligence, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional

---

[7] The C.s also assert violations of their Fourteenth Amendment rights, but the Fourteenth Amendment does not apply to the District of Columbia. *See Smith v. United States*, 460 A.2d 576, 578 n.3 (D.C. 1983) (per curiam). Instead, due process and equal protection claims raised in the District fall under the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

distress, and negligent hiring, training, supervision and retention. Judge John M. Mott dismissed the case against the individual defendants pursuant to a Rule 12 (b)(6) motion. Judge Mott later granted the District's motion for summary judgment. The C.s filed an appeal from the trial court's decision to dismiss the individual defendants under Rule 12 (b)(6) and to grant summary judgment to the District on all counts.

The trial court issued a protective order in this case. The Washington Post filed a motion to intervene and for access to the summary judgment pleadings, including the motion, opposition, and exhibits. The trial court did not explicitly rule on this motion before it issued its sealed summary judgment order in favor of the District, whereupon the Washington Post filed a second motion to intervene and for access to the court's order. In a subsequent written order, the trial court granted the Washington Post's motion for access to a redacted version of the summary judgment order. The trial court did not explain its rationale for its redactions. The Washington Post has filed appeals seeking disclosure of both the summary judgment pleadings by the parties and an unredacted copy of the trial court's summary judgment order.

## II. Discussion of the C.s' Appeal

### A. Section 1983 Claims

To make out a § 1983 claim against the District of Columbia, the plaintiff must make a two-part showing. First, the plaintiff must demonstrate that a constitutional violation has occurred. Second, and only if there is a constitutional violation, the court must determine whether that constitutional violation is directly attributable to a District "custom" or "policy." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007).

### 1. Seizure of N.C. and Jo.C.

The C.s argue that the District violated their Fourth Amendment right to be free from unreasonable seizures when the District removed their children, N.C. and Jo.C. In particular, they argue that the constitutional violation was especially egregious in the case of Jo.C., for whom they claim "there was no evidence (literally *none*) that [Jo.C.] was abused or neglected." They also criticize the manner in which Jo.C. was removed by CFSA, at around 1:00 a.m. and with MPD officers present, the manner in which Jo.C. was medically tested all night before

being placed into shelter care, and the manner in which Jo.C. and N.C. were thereafter temporarily held in shelter care.

The government's removal of minor children from their parents constitutes a seizure within the meaning of the Fourth Amendment. *Doe v. District of Columbia*, 796 F.3d 96, 103 (D.C. Cir. 2015). Accordingly, under the Fourth Amendment, a lawful seizure of children from their parents' custody requires a court order, e.g., a warrant, probable cause, or exigent circumstances. *See Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011). Additionally, "Fourth Amendment law presumes that warrantless searches and seizures inside a home are unreasonable absent exigent circumstances," so if the children are removed from the parental home, the Fourth Amendment requires a warrant or exigent circumstances to justify entry into the home to seize and remove the children, such as the need to protect the children inside of the home from imminent harm. *Oliver v. United States*, 656 A.2d 1159, 1164-65 (D.C. 1995).[8]

---

[8] We note that some jurisdictions appear to allow the government to enter the home and seize children on the basis of probable cause alone. *See Hernandez, supra*, 657 F.3d at 474-75. However, under our case law, we presume that warrantless searches and seizures inside of a home are unreasonable, and therefore, unconstitutional, absent exigent circumstances. *Oliver, supra*, 656 A.2d at 1164.

N.C. was in the hospital at the time CFSA placed her in a medical hold. We conclude that there was probable cause to put a medical hold on N.C. and thereafter place her in temporary shelter care given the extremely serious allegations of child abuse (shaken baby syndrome) made by an expert on child abuse, Dr. Jackson, after examining N.C. and discovering unexplainable bleeding in her brain and retinal hemorrhages in both eyes. Probable cause is a "common-sensical standard," and the facts here sufficiently demonstrated a need for CFSA to hold N.C. pending a more in-depth investigation. *See Florida v. Harris*, 568 U.S. 237, 244 (2013); D.C. Code § 16-2309 (a)(3) & (4) (2012 Repl.). Additionally, we conclude that the manner in which the District seized N.C. was reasonable and did not violate the Fourth Amendment. N.C. was already at the hospital for head trauma which Children's National believed to be the result of shaken baby syndrome, so a medical hold was appropriate. Judge Zoe Bush made a prompt initial probable cause determination on September 3rd based on Dr. Jackson's initial report.

We likewise conclude that the District also initially had probable cause to seize Jo.C. Under the District of Columbia's child abuse and neglect statutory scheme, because N.C. was a child suspected of being abused, Jo.C., as "another child living in the same household" and "under the care of the same parent[s]" of

N.C., met the legal criteria for a "neglected child." D.C. Code § 16-2301 (9)(A)(v) (2012 Repl.). In *In re S.G.*, we explained that a child living in the same household as another suspected abused child can be considered "in danger of abuse and should be removed from the home for [her] own safety." 581 A.2d 771, 778 (D.C. 1990). Jo.C. and N.C. were both infants living in the same household, and because of the particularly serious child abuse allegations regarding N.C., CFSA had probable cause to believe that Jo.C. was a "neglected child" within the meaning of D.C. Code § 16-2301 (9)(A)(v).

However, the fact that the District initially had probable cause to seize Jo.C. does not end our inquiry as to the legality of the District's actions when it seized Jo.C. without a warrant. This is because Jo.C. was seized from inside of the parental home and "Fourth Amendment law presumes that warrantless searches and seizures *inside a home* are unreasonable absent exigent circumstances." *Oliver*, *supra*, 656 A.2d at 1164 (emphasis added). There is some debate as to whether the government must prove reasonable, articulable suspicion of child abuse or the higher probable cause standard before the government is allowed to seize a child under the "exigent circumstances" doctrine. *Doe*, *supra*, 796 F.3d at 104 (observing that federal circuits are split among those that only require reasonable suspicion of past abuse to justify a warrantless seizure, those that

require reasonable suspicion of imminent abuse, and the Eleventh Circuit which requires probable cause). This is an unsettled question of law that we need not currently decide. *See Evans v. United States*, 122 A.3d 876, 881 (D.C. 2015). We remand this fact-intensive question to the trial court to weigh the evidence in the record to determine whether exigent circumstances existed justifying the District's warrantless seizure of Jo.C. from the C.s' home in the early-morning hours of September 1st. We ask that the trial court determine whether there is a material issue of fact as to how long CFSA waited between seizing N.C. from the hospital and seizing Jo.C. from the parental home, as that answer likely bears on whether the government reasonably believed an exigency existed. We also ask the trial court to determine whether the District had a policy that securing a warrant was not required in circumstances such as these. Last, we ask that the trial court consider whether the facts surrounding the manner and circumstances under which Jo.C. was removed from the C.s' home violated the Fourth Amendment's prohibition against unreasonable seizures.[9]

---

[9] The C.s also raise a concern about the medical tests performed on Jo.C. upon her removal. This issue is dependent on the trial court's conclusion as to whether the warrantless seizure of Jo.C. was lawful. Assuming the District's actions in removing Jo.C. were lawful, however, we see no constitutional concerns with the tests given to Jo.C. in light of Jo.C.'s age and concerns that her twin N.C. had just been diagnosed with shaken baby syndrome. D.C. Code § 4-1301.08 (2012 Repl.) (CFSA investigator may conduct medical tests, such as radiological examinations and x-rays performed on child as part of investigation into child

(continued . . .)

The C.s alternatively argue that, even if the District was justified in initially removing both children from the parents, the District thereafter acted unlawfully when the District continued to hold the children even after probable cause had "dissipated." The C.s' argument hinges on whether Dr. Jackson's follow-up report on September 4th backed away from her earlier hypothesis of shaken baby syndrome. Specifically, Dr. Jackson's later report stated that N.C.'s retinal hemorrhages cannot be explained, so "inflicted head trauma remains a possibility." Whether Dr. Jackson's terminology constitutes a backing away from her earlier assessment, causing probable cause to dissipate, is an issue that we believe the trial court must consider and resolve in the first instance. "Lacking the benefit of the [trial] court's analysis of whether genuine issues of material fact exist that would preclude the entry of summary judgment, we believe the most prudent course is to remand for the [trial] court to consider this issue in the first instance." *Solomon v. Vilsack*, 628 F.3d 555, 568 (D.C. Cir. 2010).

---

(. . . continued)

abuse and neglect). Finally, the temporary placement of both children in shelter care, on the basis of these allegations of serious child abuse, did not rise to the level of a constitutional violation. *See* D.C. Code §§ 16-2312 (d)(3) & -2310 (b) (2012 Repl.).

## 2. The C.s' Fifth Amendment Procedural Due Process Claim

The C.s argue that their automatic inclusion on the District of Columbia's Child Protection Register ("Register" or "Registry") for an "inconclusive" report of child abuse, and without the benefit of a hearing beforehand, violated their procedural due process rights under the Fifth Amendment, sufficient to bring a § 1983 challenge.[10] We hold that the District did not violate the C.s' procedural due process rights by automatically including their names on the Register.

Due process protects individuals from arbitrary government actions, and thus gives individuals an opportunity to be meaningfully heard before the

---

[10] The C.s make two other, separate procedural due process challenges that we can decide summarily. First, they argue that the seizure of their children without a hearing violated their procedural due process rights, but no pre-seizure hearing is required if the seizure is justified by either probable cause, a warrant, or exigent circumstances. *See Hernandez, supra*, 657 F.3d at 474. Therefore, if on remand, the trial court concludes that exigent circumstances justified Jo.C.'s warrantless seizure, and if we were to agree with the trial court's conclusion, the C.s' procedural due process rights would not have been violated. Second, the C.s argue that CFSA's delay in having a family team meeting violated their due process rights. However, the plain wording of the statute indicates that CFSA is not required to have a family team meeting with the parents, so again there is no violation of the C.s' constitutional rights. *See* D.C. Code § 16-2312 (a-1)(1) ("During the 72-hour period authorized [after a child is alleged to be abused or neglected and taken into custody] the Agency *may* convene a family meeting to solicit the input of family members, relatives, and others concerned with the welfare of the child to develop a safety plan approved by the Agency.") (emphasis added).

"deprivation of a significant interest." *In re Richardson*, 481 A.2d 473, 481 (D.C. 1984). We employ a two-step analysis in addressing procedural due process challenges, first, a determination of "the nature and extent of the asserted interest" and, second, "an evaluation of the adequacy of the challenged process." *Watso v. Colo. Dep't of Soc. Servs.*, 841 P.2d 299, 304 (Col. 1992) (en banc).

CFSA is required to maintain the Register with every "substantiated" or "inconclusive" report of child abuse or neglect documented and investigated in the District of Columbia. *V.K. v. Child & Family Servs. Agency*, 14 A.3d 628, 629 (D.C. 2011) (citing D.C. Code §§ 4-1321.03 (b)(3) & -1302.02 (a)(2) (2012 Repl.)). An "inconclusive report" means a report that cannot be proven to be either "substantiated" or "unfounded." D.C. Code § 4-1301.02 (13A) (2018 Supp.). Here, the C.s were added to the Registry for an inconclusive report because, although Magistrate Judge Rook found that the government lacked probable cause of child abuse or neglect, the government maintained that there were serious questions and concerns as to how N.C. received her injuries. The government's allegations were supported to some degree by Dr. Jackson's reports and testimony. The Registry's purposes are to "identify neglected children" and "to assure that protective services will be made available to a neglected child to protect the child and his or her siblings and to prevent further abuse or neglect." D.C. Code § 4-

1321.01 (2012 Repl.). Access to information contained within the Register is limited, however, to "specified law enforcement and child welfare agencies." *V.K.*, *supra*, 14 A.3d at 629. Schools and public or private organizations working with children may also have access to substantiated reports of child abuse on the Register, but not inconclusive reports, "for the purpose of making employment decisions regarding employees and volunteers." D.C. Code § 4-1302.03 (a-1)(1) (2012 Repl.). The Register is also tasked with ensuring that "only that information which is necessary for the purpose of the request" is divulged and must strive to maintain the "confidentiality of the persons identified in the report" whenever possible. *Id.* § 4-1302.03 (e).

In considering the C.s' claim that placing them on the Registry violated their due process rights, we find persuasive the analysis of the Supreme Court of Colorado's en banc decision in *Watso v. Colorado Department of Social Services*, which considered the question we are confronted with here — whether automatic inclusion on the Registry violates the C.s' procedural due process rights. In *Watso*, the plaintiffs asserted that their automatic inclusion on the Colorado child abuse state registry, which is akin to the District's Register, violated their Fifth Amendment due process rights. *Id.* at 304. The court in *Watso* concluded that the "interest of a parent in maintaining the stability and autonomy of the family unit"

was a constitutionally protected interest, that could be interrupted when the state intervenes and adds a parent's name to a child abuse registry. *Id.* at 306-07. We likewise conclude that parents have a constitutionally protected interest that inclusion on a child abuse registry has the potential to affect, and therefore procedural due process rights attach. *Id.* at 307.[11] We recognize that a parent's inclusion on a child abuse registry may potentially affect the parent's relationship with his or her child in the community.

The District asserts that there are protections and safeguards built into the Registry process to protect due process rights. We employ the test enunciated by the Supreme Court in *Mathews v. Eldridge* to make a determination as to whether these safeguards built into the District's registration process are sufficient to protect the C.s' procedural due process rights:

> **First**, the private interest that will be affected by the official action; **second**, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and **finally**, the [g]overnment's interest, including the function involved and the fiscal

---

[11] Citing to *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), the C.s also argue that they suffered reputational harm as a result of being placed on the register. However, "reputation alone, apart from some more tangible interests such as employment, is" insufficient by itself "to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334-35 (1976) (emphasis added).

Under the first factor of the *Mathews* test, requiring us to examine the impact of government action on a private interest, we conclude that the C.s' automatic inclusion on the Register based on the inconclusive report of neglect does not materially affect their relationship with their children, or their ability to interact with them. Moreover, the Register helps promote the strong government interest in protecting children from abuse and neglect, and preventing new incidents of abuse. *See Watso*, *supra*, 841 P.2d at 308.

As to the second factor, the C.s primarily argue that they did not have the benefit of due process prior to their inclusion on the Register. While generally a "state may not deprive persons of protected liberty interests without first affording such persons meaningful opportunities to prevent such governmental action," in instances "when a state can demonstrate necessity for immediate action to protect a legitimate interest of its own, adequate *post-deprivation* hearings may satisfy due process standards." *Id.* (emphasis added). We are persuaded by the District's argument that the C.s' due process interests are adequately protected by the post-inclusion hearing and procedures that are available to them under the statute to

correct or remove incorrect or unfounded information. D.C. Code § 4-1302.06 (2012 Repl.). The record reflects that the C.s were able to promptly challenge their inclusion on the Registry, and that following a hearing, were able to have their names removed.

Lastly, as to the third *Mathews* factor looking at the government's interest, including practical considerations of the C.s' inclusion on the Registry prior to a due process hearing, we conclude that the District has demonstrated that there exists an important District interest in promptly adding "inconclusive" reports of abuse to the Registry, that would be undermined and impeded by pre-inclusion hearing procedures that the C.s argue for. Consequently, the C.s failed to present prima facie evidence that their constitutional rights were violated by their inclusion on the Register.

### 3. The C.s' Remaining Constitutional Claims

The C.s raise several additional constitutional claims under § 1983 that we decide and address in turn. First, the C.s argue that the District violated their substantive due process right to raise their children by seizing them. However, the C.s cannot maintain a separate substantive due process argument because they are

already claiming a Fourth Amendment violation in relation to the government's seizure of their children. It is well-established that a substantive due process claim cannot be alleged if there is a more specific constitutional provision that addresses the rights that are claimed to have been violated. *Hernandez*, *supra*, 657 F.3d at 474. The C.s' argument that the government unlawfully seized their children without a warrant clearly constitutes a Fourth Amendment claim. Accordingly, they cannot simultaneously assert a substantive due process claim under the Fifth Amendment.

Second, the C.s contend that their separation from their children for about two weeks was a "greater than [] necessary" intrusion, and therefore violated their substantive due process rights. They also argue that alternative family placements other than shelter care, although possible options, were never considered. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928-29 (7th Cir. 2011). On this record, we cannot say that the two week separation of N.C. and Jo.C. from their parents was a "greater than [] necessary" intrusion given the serious allegations of child abuse. A two-week separation is fairly short for a child abuse and neglect case, especially in light of the serious, life-threatening claims of child abuse alleged here. Moreover, the government promptly returned both children to the C.s following Magistrate Judge Rook's order finding no probable cause. The record

does not reflect that the government's actions were "so egregious" or "so outrageous" as to constitute a violation of their due process rights. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Contrary to the C.s' argument, the fact that Mr. Beougher testified that the District should have, under national standards of care, considered alternatives to shelter care for N.C. and Jo.C., while perhaps relevant in considering common law negligence, is insufficient to make out a prima facie violation of constitutional rights.[12]

Third, the C.s argue that their equal protection rights under the Fifth Amendment were violated, claiming that certain CFSA employees made disparaging comments pertaining to the allegedly better treatment that the C.s received in their case because of their race (Caucasian) and higher economic status compared to the treatment received by minority families living in the District. In order to sustain an equal protection argument, the C.s had the burden of establishing that a material issue of fact existed evidencing that the District has a policy or custom that treats individuals accused of child abuse or neglect differently solely on account of race or socio-economic status. If the C.s' are

---

[12] "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." *Baker v. McCollan*, 443 U.S. 137, 146 (1979).

claiming that they were treated *better* on account of their race and socio-economic status, then we think it unlikely that the C.s have standing to raise an equal protection claim. *See, e.g.*, *N.E. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 663 (1993) (standing requires an "injury in fact"). If the C.s are claiming that they were treated worse on account of their race and socio-economic status, other than a few isolated remarks that do not unambiguously indicate racial animus by certain CFSA employees, the record is devoid of evidence of such discrimination. Therefore, there is no material dispute of fact that demonstrates that the C.s' rights under the Equal Protection Clause were violated.

### B. Common Law Tort Claims

We next turn to the C.s' common law tort claims against both the District and the individual defendants — negligence and gross negligence, abuse of process, intentional and negligent infliction of emotional distress, and negligent hiring, training, supervision and retention. The trial court concluded that all of the District's actions at issue were discretionary, rather than ministerial, and thus the District is not liable because its actions were protected by sovereign immunity. We have said that whether the District has immunity under this doctrine is a

question for the trial court, rather than the jury, which may turn on factual determinations that are made by the trial court. *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 (D.C. 1995). We therefore remand for the trial court to more carefully analyze the issue of sovereign immunity in light of the specific actions being challenged and in light of the specific evidence. We ask that the trial court address the extent to which each specific action alleged was or was not driven by a District policy.

Likewise, we remand for the trial court to more closely analyze the issue of whether the individual defendants were entitled to immunity.[13] The trial court dismissed all charges against the individual defendants in an oral ruling, stating without explanation, "They have immunity." From this statement, we are unable

---

[13] On this record, however, we can substantively resolve one issue pertaining to the individual defendants raised by the C.s. The C.s argue that the petitions to extend the five-day hold of their children were predicated on "false or incorrect" information provided by Investigator Geheren in the District's petitions alleging abuse and neglect filed before Magistrate Judge Rook. Investigator Geheren stated in the petitions that N.C. "has been abused by [her] parent[s]" and Jo.C. was in "imminent danger of being abused" because she lived in the same household of another child (N.C.) who "has been abused." When Investigator Geheren was presented with the petitions in her deposition, she conceded that she should have written "allegedly" into the petitions because the District "had no proof yet." At best, the omission of the word "allegedly" in the petitions was not prejudicial. The petitions could not have misled the trial court into believing that the District had already proven its case of abuse or neglect because the court had not yet even decided whether the District had probable cause to hold both children.

to glean whether the trial court was relying on qualified immunity or absolute immunity, or the trial court's reasoning to determine whether immunity was properly granted. Therefore, we remand for the trial court to more fully consider and explain its ruling.

## III. The Washington Post's Appeals

The Washington Post contends that the trial court abused its discretion by sealing the summary judgment pleadings in their entirety and only providing a heavily redacted version of its summary judgment order. The Washington Post's argument hinges on the widely accepted principle that the public has a presumptive right of access to civil filings, and in particular to summary judgment pleadings and orders. *Mokhiber v. Davis*, 537 A.2d 1100, 1106 (D.C. 1988). This presumption of open public records is particularly strong with regard to documents in connection with a motion for summary judgment because parties' substantive rights have been decided on motion in lieu of a trial. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988). In the District of Columbia, the presumptive right to access records is premised on common law traditions, which

are not absolute,[14] *Mokhiber*, *supra*, 537 A.2d at 1106, 1108. Whether a case should be sealed requires the weighing of factors and interests, which should be left to the discretion of the trial court. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978).

We must balance the right of the public and the press to open civil proceedings, with the District's interest in keeping child abuse and neglect cases confidential, when we determine which public court filings should or should not be sealed. The D.C. Circuit established a six-factor balancing test first articulated in *United States v. Hubbard*, 650 F.2d 293, 317-322 (D.C. Cir. 1980), for such circumstances, which we find persuasive in deciding the issues before us. The factors are:

> (1) the need for public access to the documents at issue;
> (2) the extent to which the public had access to the document prior to the sealing order; (3) the fact that a

---

[14] *Amici curiae*, a consortium of media organizations and the Reporters Committee for Freedom of the Press, argue that the public has a First Amendment right to open civil trial proceedings and records, and that this court should overrule *Mokhiber*. As an initial matter, because the Washington Post's brief does not seek to define this case under the First Amendment, *amici* do not have standing to raise an independent issue on appeal. *Briggs v. United States*, 597 A.2d 370, 373 (D.C. 1991). Moreover, we cannot overrule *Mokhiber* absent en banc review. *Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1075 (D.C. 1998) ("The rule is fundamental in our jurisprudence that 'no division of this court will overrule a prior decision of this court." (quoting *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)).

> party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purpose for which the documents were introduced.

*TIG Ins. Co. v. Firemen's Ins. Co.*, 718 F. Supp. 2d 90, 95 (D.D.C. 2010) (citation and internal quotation marks omitted).

The trial court did not explain why the parties' summary judgment pleadings should be kept under seal in their entirety. The Washington Post was informally notified that the trial court had resolved its motion when the court granted the District's summary judgment motion and dismissed the case pursuant to the sealed summary judgment order. We remand for the trial court to expressly consider whether the summary judgment pleadings in their entirety should be kept under seal based on the *Hubbard* balancing test highlighted above. We also remand for the trial court to apply the proper framework under the *Hubbard* factors in making and explaining its redactions to the summary judgment order.

## IV.   Conclusion

In this consolidated appeal, we have answered the constitutional questions that can be clearly decided from the existing record. However, the current record

is insufficient to enable us to address the remaining constitutional questions. We therefore remand for the trial court to consider some of the remaining and more fact-intensive issues in the first instance. The trial court, in granting summary judgment to the District, did not specifically address the constitutionality of the District's actions in seizing the infants, which we conclude are critical to resolving the C.s' § 1983 claims. Specifically, we remand for the trial court to determine (1) whether there were exigent circumstances justifying the warrantless seizure of Jo.C. from the parental home; and (2) whether probable cause continued to exist for both N.C. and Jo.C. after Dr. Jackson issued her second medical report. We also remand for the trial court to explain its decision in granting summary judgment with respect to: (1) the common law tort claims against the District; and (2) dismissal of the individual defendants from the suit on immunity grounds.

Finally, we remand for the trial court to determine whether the parties' summary judgment pleadings should be kept under seal in their entirety by balancing those competing interests pursuant to the *Hubbard* balancing test. We also ask the trial court to apply the *Hubbard* test in making the redactions to its summary judgment order, and to explain its decision-making.

*So ordered.*